CAIN v. STATE.*

(Division B. June 16, 1924.)

[100 So. 578. No. 23955.]

1. CRIMINAL LAW. *Character of deceased with respect to peculiar trait involved must be established by general reputation in community.*

In a trial for homicide, where the character of the deceased becomes pertinent, it must be established by the general reputation for the peculiar trait involved in the community in which he lived, and a defendant will not be permitted to testify as to his personal opinion or estimate of the character of the deceased.

2.  HOMICIDE.  *Rule stated as to admissibility of statements of deceased prior to killing.*

    The statement of a person killed, made prior to the killing, not made in the presence of the defendant, is not admissible, unless it contains a threat, and in such trial the defendant is not entitled to show a stated purpose of the deceased to take his wife from him, or that deceased did not regard the defendant favorably.

3.  WITNESSES.  *Testimony in contradiction of witness, denying making of inconsistent statements, held admissible, though variant in some respects from predicate laid.*

    Where a predicate is laid for impeachment of a witness, wherein two persons were named as being present and the time and place fixed, and the witness denies that one of the named parties was present, but recalls the time and place and other person present on that occasion, but denies making the statement, such witness may be contradicted by showing she made the alleged statement, although the contradicting witness testifies that only one of the persons named in the predicate was present at said time and place.

4.  · CRIMINAL LAW.  *Lack of explicitness in meaning of instruction not necessarily reversible error; instruction as to reasonable doubt held not reversible error for lack of clearness.*

    In a criminal trial the instructions should be clear and explicit, but it is not necessarily reversible error to give one not explicit in its meaning.  The court will not reverse because the court below instructed for the state:  "You are not required by the laws of this state to know the defendant is guilty of the crime charged against him before you can convict him, and you should not hesitate to find that he is guilty before you are able to say, outside of the evidence, that he might have been innocent," etc.  *Jones* v. *State*, 130 Miss. 703, 94 So. 851; *Harris* v. *State*, (Miss.), 99 So. 754, cited.

5.  CRIMINAL LAW.  *Judgment not reversed for refusal to give the two reasonable theories instruction.*

    In a criminal case, where the principles of law are fully given in the instructions given, the court will not reverse for the refusal to give what is known as "the two reasonable theories instruction" and this is especially true, where the evidence is from eyewitnesses, and not what is known as circumstantial evidence.

*Headnote 1.  Criminal Law, 16 C. J., section 1543, section 1532; Homicide, 30 C. J., section 397;  2.  Homicide, 30 C. J., section 427;  3. Witnesses, 40 Cyc, p. 2731;  4.  Criminal Law, 17 C. J., section 3689; 5.  Criminal Law, 16 C. J., section 2506.

APPEAL from circuit court of Lowndes county.

HON. JOHN D. GREENE, Judge.

H. L. Cain was convicted of manslaughter, and he appeals. Affirmed.

*Owen & Garnett,* for appellant.

The first assignment of error is that testimony was excluded from the jury as to the knowledge that appellant had of the dangerous character of Lee Holly. Appellant was asked: "Did you know whether he was considered a dangerous man or not?" This question was objected to and the objection sustained, and the appellant was not allowed to prove the dangerous character known to him of the deceased. This, we submit, was error. 13 R. C. L. 822, section 126; *Smith* v. *State,* 23 So. (Miss.) 260.

A man's reputation merely for peace or violence is not sufficient. The general reputation of Lee Holly might have been that of a dangerous man, and yet the appellant, Cain, might have personally had the opinion of him that he was not dangerous. On the contrary, he might have had the reputation of being a peaceable man, and yet appellant might have had the opinion of him that he was a dangerous man, and we submit that appellant's opinion when he faced him on that fatal day, as to his dangerous character, his knowledge of it, was material.

The second assignment of error is the exclusion of certain testimony offered by the appellant's witness, Irwin. See *Spivey* v. *State,* 58 Miss. 858. We call the court's attention also to *Leverett* v. *State,* 73 So. (Miss.) 273, where a man killed Bradley about Leverett's wife, and the court held that an instruction should not limit the defendant to what actually happened at the moment, but that the instruction should have allowed the jury to consider what led up to the difficulty and the facts out of which the controversy grew.

The court erred in granting for the state instruction No. 6. *Jones* v. *State,* 94 So. (Miss.) 851; *Lipscomb* v. *State,* 23 So. 212; *Kelly* v. *State,* 72 So. 928.

*F. S. Harmon,* for the state.

It is said that the court erred in excluding from the jury the defendant's answer to the question: "Did you know whether deceased was considered a dangerous man or not?" The learned district attorney correctly objected to this question, and the court excluded it on the ground that while you can impeach a man's reputation in the usual way, the personal opinion of him which the defendant has, makes no difference. This seems clearly right. There is a great difference between knowing the deceased's reputation for peace and violence and knowing whether he was considered a dangerous man, since the latter involves a conclusion on the part of the appellant which he had no right to give to the jury. Therefore, the objection was correctly sustained.

Similarly, there is no merit in the second assignment of error, since the court correctly excluded from the jury the conversation of Rube Irwin with the deceased Holly, in which witness Irwin discoursed exhaustively as to the advice which he gave Lee Holly, and Holly's answer to him, in which answer Holly described the appellant as a damned cur. The court overruled a preliminary objection to this testimony and allowed the witness to go ahead and complete his statement as to this conversation so as to make sure of the character of the testimony. But when it turned out to be nothing but advice on one hand and an application of epithets to the appellant on the other, there was no sane course open to the court save to exclude the entire statement. There was not a line of testimony here in which Holly threatened Cain or threatened to do harm to him, and there is no way, under the rules of evidence, by which this testimony could have been correctly admitted.

Finally, it is alleged that the court erred in allowing witness Ottley to testify in rebuttal regarding a conversation which he had the afternoon of the killing with Mrs. Cain. Mrs. Cain denied under cross-examination that she

saw either Will Ottley or E. G. Blewett on the afternoon in question at the bars in Steve Ottley's field. She denied that she told these two parties that Cain ran after her with an axe, and declared, "I wasn't over there at those bars that afternoon." Now, when Ottley was introduced in rebuttal to impeach the credibility of Mrs. Cain's testimony, the defense objected on the ground that Tom Blewett was not at the bars and that Mrs. Cain expressly said that she had not seen Blewett. The testimony was admitted, to which the defendant took exception. But this testimony was correctly admitted, since Mrs. Cain had denied absolutely that she was at the bars that afternoon, and Ottley's testimony was equally positive that she was. He was positive, likewise, as to what she told him, and the fact that one of the men was at his house and not down at the bars in no wise alters the rule as to the laying of a sufficient predicate. Had Mrs. Cain stopped with the statement that she did not see these two parties down at the bars, there might be some merit in appellant's contention. But when she went further and swore that she was not down at the bars that afternoon at all, it is clear that the statement of Will Ottley that he talked to her at the bars was admissible.

Exception is taken to charge number 6 for the state. The charge here given the jury was discussed in the case of *Jones* v. *State,* 94 So. 852. The word "because" was erroneously inserted in the Jones case where the word "before" was intended, and the court declared that with this error in language it was difficult to understand the exact meaning of the instruction; but in view of the many skillfully drawn and exhaustively liberal instructions granted the defendant, this one could not have misled the jury. In the case at bar, the typographical error did not occur, the correct word was used, and yet counsel labors to bring the instruction within the erroneous class. The most casual reference to the Jones case is enough to show the trivial nature of such an argument.

Again, in the sixth assignment of error, appellant cites the case of *Leverett* v. *State.* A reference to 73 So. 275, shows that the two instructions there under consideration are entirely different from any contained herein. The plain fact of the business is that the appellant, like Cain of old, was found guilty of beating out Lee Holly's brains with an axe, while he stood before him begging for mercy. He got the fair trial granted him by the laws of the land. The jury reached the only legitimate conclusion which the uncontradicted evidence in the case justified, and in the absence of any ground for reversal, this case will be affirmed.

ETHRIDGE, J., delivered the opinion of the court.

The appellant, Cain, was indicted for the murder of Lee Holly, and was convicted of manslaughter and sentenced to the penitentiary for a term of seventeen years.

The deceased, Lee Holly, and Mrs. Cain were formerly husband and wife, and by said marriage had three children, one daughter, who was married at the time of the killing, and two small sons. A few years before the killing Mrs. Cain, then Mrs. Holly, procured a divorce from Holly, the deceased, and some six months afterward married the appellant, Cain, and they lived together as husband and wife until a short time before the killing.

Mrs. Cain went to visit her daughter, Mrs. Brooks Stinson, who was working at a mill in Lowndes county, Miss., where Lee Holly also lived, and where he operated a commissary. During the visit at her daughter's house Mrs. Cain decided to quit Mr. Cain and come and live with her daughter, and she and one of her small sons went back to the Cain home and procured her effects and moved them to Brooks Stinson's house. Stinson for some reason objected to Mrs. Cain moving back under the circumstances because she was the wife of Cain. Mr. Holly caused a house to be built near the commissary where he was working, and Mrs. Cain moved into the house so built and occupied it with one of her small sons, while Holly and another of her sons occupied the rear of the commis-

sary as a room. But Holly and the two boys and Mrs. Cain all ate in the new house so built by Mr. Holly; she doing the cooking for all of them and Holly furnishing the food. On the Saturday before the killing Holly took Mrs. Cain to Aberdeen for the purpose of her filing a bill against the appellant, Cain, for a divorce, and Holly paid the cash payment required on the fee by giving his personal check therefor. On the following day Holly took Mrs. Cain to a public gathering of some kind near the line between Lowndes and Monroe counties, and it seems that Cain was also at this gathering and tried to have a conversation with Mrs. Cain, his wife, who declined to talk with him. On the following day, Monday, Cain and a brother of his came down to near where the mill was in a car belonging to Cain's brother, where the brother stopped with the car, and Cain went on to the mill, and stood around the mill for some time, had a conversation with Brooks Stinson, his wife's son-in-law, and after a time went to the house occupied by Mrs. Cain, and went in the house. When he went into the house, he found Mrs. Cain and one of her small sons and Mr. Holly in the room. Mr. Holly was sitting on a trunk, and Mrs. Cain was lying on the bed, being sick. According to the boy who was present Cain came into the house and looked first at Mr. Holly and then at Mrs. Cain, and back at Holly, and then pulled his pistol, shooting Holly, the ball striking Holly's cheek in front, and penetrating the flesh, and coming out of the rear of his ear. Holly jumped up and grappled with Cain, and they scuffled out of the house fighting together and fell over a small wagon belonging to the small boy; Cain being underneath and Holly on top of him, when Brooks Stinson came up and disarmed Cain by taking the pistol away from him. Both men arose, and Holly ran back in the house and closed the door, and Cain followed, pushed the door open, and entered into a struggle with Holly. By some means they were separated, and Holly was carried to a house near by. Cain then procured an ax, and was pursuing Mrs. Cain with the ax. She called to Stin-

son for protection, and he got between Cain and Mrs. Cain. It appears that the noise made caused Holly to think that Cain was attacking the children, and he came out of the house where he was concealed, and Cain took after him with the ax. Holly retreated. In the meantime Stinson had gone to get a car for the purpose of carrying Holly to a hospital, and as Cain came up with Holly near where Stinson was with the automobile, according to some of the witnesses, Holly picked up a piece of a baseball bat, and held it in his hand. According to other witnesses he was standing begging Cain not to kill him; that he had done nothing to him. Cain approached and struck Holly with the back of the ax, crushing his skull, and struck twice at him with the blade of the ax, but did not inflict fatal wounds with the blade of the ax. Stinson testified that he then asked Cain to let him take Holly to a hospital in the automobile. At first Cain would not do so, using vile epithets with reference to Holly, but finally let Stinson place him in the automobile and take him to a hospital, where Holly shortly afterwards died.

During the trouble some one had gone to Ottley, who owned the mill, and he and another man came down in a car armed with a gun and arrested Cain and carried him to jail. They said that Cain stated to them that he came down there to kill or get killed. Cain testified that he did not know that Holly was in the house, and that he went in to see Mrs. Cain, and that when he came in that Holly made a movement as if to draw a weapon, and that he, Cain, shot Holly in self-defense, believing he was going to draw a weapon; that Holly rose and grappled with him, and they went out of the house struggling together and fell, and while he was down with Holly on top of him that some one disarmed him; that he did not know what happened until just before striking Holly with the ax, when he saw Holly with a piece of the baseball bat, and he struck Holly with the ax in self-defense.

Mrs. Cain was introduced, and testified in behalf of Cain, her husband, and contradicted her sons as to how the killing occurred, and contradicted them as to Cain attacking her and pursuing her with an ax. In examining Cain the attorneys asked him:

"Q. Did you know his reputation for peace and violence (referring to Lee Holly, the deceased)? A. Yes, sir.

"Q. Did you know whether he was considered a dangerous man or not?

"The state objects to the form of the question.

"The court: Yes.

"The appellant's attorney asked what he thought of him as an adversary.

"State's Attorney: We object to what he thinks of him personally. You can impeach a man's reputation in the usual way, but his personal opinion of him makes no difference.

"Appellant's Attorney: It makes a difference when you have a difficulty with a man.

"State's Attorney: I say not.

"The Court: The objection is sustained."

The refusal of the court to permit Cain to state what he thought of Holly as an adversary constitutes the first assignment of error. The personal opinion of Cain as to whether Holly was a dangerous man or not is not relevant. If he was a dangerous man that must be established by his general reputation in the community in which he lived.

The defendant sought to prove by the witness Irwin a conversation with Holly with reference to Cain. In answer to the question: "Tell the jury what that conversation was," the witness said:

"It was after he had done taken his wife—taken his wife away from him over to Lowndes county.

"Q. How long was it before the killing? A. It was Friday before the killing Monday. I told Mr. Holly—I asked him—I said, 'Lee, what are you hanging around

here for? You have done taken Cain's wife away from him, and it looks like you might tempt the man, and he is liable to hurt you and get you into trouble,' and I said, 'It looks like it is best for you to stay away from here.'

"District Attorney: We object to that; it is a piece of advice from this gentleman to Lee Holly.

"Appellant's Attorney: Go ahead, Mr. Irwin.

"Witness: A. And he told me, 'I haven't had anything to do with Cain's wife'; and I said, 'No, Lee, you can't put that kind of stuff in me and make me believe it; you would not be hanging around here if you wasn't after something'; and he acknowledged to me that he was going to take Cain's wife, and she was going to sue for a divorce, and he was going to marry her—take her back. He said Cain was a damned cur; 'he will not hurt me; he will not do a thing; I ain't afraid of him.'

"The District Attorney: I move to exclude the whole statement, for the reason that it is simply a piece of advice on the part of Rube Irwin, on the assumption that Lee Holly had taken Mr. Cain's wife away from him.

"The court: Yes, it will be excluded; I could not tell what he was going to say.

"Appellant's Counsel: Your honor, please, you don't want to be heard on that at all?

"The court: No, sir. Gentlemen of the jury, you will not consider that testimony; that is excluded."

Exception.

We do not think the statement was admissible. It appears simply to be an effort to inject into the case the so-called unwritten law. When Mrs. Cain was on the stand she was asked in reference to a conversation with Mr. Ottley and Mr. Blewett at the bars near Ottley's place, and she denied making the statement, and denied that Blewett was there at the time, but remembered the time and place and Ottley's presence. She was asked if she did not state in that conversation that Cain chased her with an ax at the time of the killing, and if she did not say in this conversation that she did not want Cain

to get out for fear he would kill her, or something to that effect, which conversation she denied. Ottley testified, over objection, that she did state that Cain ran after her with the ax, and she asked him not to kill her, and that she did not want Cain to get out because he would kill her. The objection is made because the predicate was laid for a conversation with Ottley and Blewett when the statement testified to by Ottley was made when Blewett was not present. The witness remembered the time and place and the conversation with Ottley, but denied the specific statement to Ottley which Ottley testified that she made. She said that Blewett was not there, and she did not see Blewett. The object in stating the time, place, and persons present in such cases is to give the witness full opportunity to recall the conversation, if any, and the circumstances and be able to make any explanation of the conversation that may have occurred. The mere fact that Blewett was named as one of the persons present in the predicate when he is shown not to have been present in the proof is not error in this case for the reason that the witness sought to be impeached remembered the conversation and the time and place and who was present.

The state asked and obtained instruction No. 6, which was also assigned for error, and which is as follows:

"The court charges the jury, for the state, that in trying this case you should not hunt for doubts, with the view of finding any excuse or apology for your verdict, nor should you indulge in such doubts as are merely conjectural or chimerical; but the doubts which ought to make you pause and hesitate must be reasonable doubts, and they must arise out of the evidence, or for want of evidence, in this cause. You are not required by the laws of this state to know the defendant is guilty of the crime charged against him before you can convict him, and you should not hesitate to find that he is guilty before you are able to say, outside of the evidence, that he might have been innocent, but, after carefully

considering all the evidence in the case, if you believe beyond every reasonable doube that he is guilty, you should discharge your duty fearlessly under your oath and under the law, and may say so by your verdict."

The giving of this instruction, while not commended, is not reversible error. *Harris* v. *State* (Miss.), 99 So. 754; *Jones* v. *State,* 130 Miss. 703, 94 So. 851.

A number of other instructions given for the state are assigned for error, and we have examined the instructions and the brief with reference thereto, and do not think that any error was committed.

The defendant complains that instruction No. 23 for the defendant was refused by the court. This instruction is what is known as the two reasonable theories instruction. The defendant procured quite a number of instructions, and had every principle of law applicable to the case presented to the jury.

This is a case arising on the testimony of eyewitnesses, and presents to the jury the question of the veracity of witnesses, and is in no sense dependent on drawing inferences from admitted or proven facts where the two reasonable theories might or might not be entertained as to such inferences. Where the law is fully and clearly given, the court will not reverse for the refusal to give other instructions.

We find no reversible error in the record, and the judgment will be affirmed.

*Affirmed.*