406 So.2d 24 (1981)
Jerry Brady WEED
v.
STATE of Mississippi.
No. 52875.
Supreme Court of Mississippi.
November 4, 1981.
Rehearing Denied December 2, 1981.
*25 Neblett, Bobo & Chapman, Ralph E. Chapman, Clarksdale, for appellant.
Bill Allain, Atty. Gen., by Mark A. Chinn, Sp. Asst. Atty. Gen., Jackson, for appellee.
Before PATTERSON, C.J., and SUGG and HAWKINS, JJ.
HAWKINS, Justice, for the Court:
Jerry Brady Weed appeals from a conviction of manslaughter in the Circuit Court of Washington County and a sentence of twelve (12) years with the State Department of Corrections. We affirm.
The assignments of error raised on his appeal which we address are:
(1) Failure of the circuit judge to sustain Weed's motion to suppress his oral statement given to officers of the Greenville Police Department.
(2) Failure of the circuit judge to order sequestration of the entire panel summoned for the special venire.
(3) Refusal of the circuit judge to grant Weed's motion for mistrial following comment by the special prosecutor during an opening statement to the jury as to what the jury would hear from the defendant.
(4) The trial court's error in sustaining the State's objection to evidence pertaining to decedent's use of drugs.
Weed, age 36 at trial, is a disabled Vietnam Veteran, having suffered the loss of one leg and one eye. At the time of the shooting, Weed had been married three times, had six children, and was separated from his third wife.
Weed had known Jerry Pearce, the victim, for 15 years. On October 18, 1979, Weed shot Pearce three times at the home of Weed's parents, and Pearce died three days later.
On January 21, 1980, Weed was indicted for the crime of murder. It is not necessary to detail the evidence at this point *26 since there was ample proof to sustain his conviction; the assignment of error to the contrary does not warrant discussion. Rather, the facts surrounding each assignment of error shall be related upon discussion of the error.

I.
Should the trial court have sustained Weed's motion to suppress oral statements he made to the police officers?
When the officers arrived at the home of Weed's parents, they found Pearce lying in the carport mortally wounded. Pearce was taken to the hospital, and Weed was given the Miranda warnings. Weed acknowledged shooting Pearce, and the admissibility of these statements is not contested. Weed contends, however, that statements made after his arrest at the Greenville Police Department should have been suppressed. At the hearing on the motion to suppress these statements, only Sergeant Ronald W. Nance testified; Weed offered no testimony to rebut this.
Nance testified he first saw Weed in the booking area. After Weed was taken to the office of Major Charles Cochran of the Greenville Police Department by Officer David Froman, Nance advised Weed of his constitutional rights, using the standard form for criminal cases. As he read the form, Nance stopped at the end of each sentence to ask Weed if he understood, and Weed replied that he did. The form fully complied with the warnings required under the state and federal constitutions to be given suspects in criminal cases.
When Nance completed reading the form, Weed asked if he could call his lawyer, Murray Akers. He was advised that he could. Weed called Aker's office, and stated, "Let me talk to Murray. This is Jerry Weed." He then paused, and stated further, "I shot somebody. I'm at the police station and I need a lawyer." Weed then hung up the telephone and told Officers Nance and Froman that Akers was in a meeting and could not talk with him.
Nance then handed Weed the rights form for Weed to read before signing. At first Weed said that he didn't need to read it, but then stated, "I guess I'd better read it before I sign it." He examined the form, and signed it. Nance and Froman then signed the form as witnesses.[1]
Nance again asked Weed if he understood his rights, and he replied that he did. Nance then asked Weed if he wanted to tell him what happened. Weed replied that he wanted his lawyer and Nance responded that it was all right for them to wait until his lawyer was present.
There was no further suggestion from the officers. Then, according to Officer Nance:
Weed sat there for a minute, then he started talking about the incident that resulted in the charge, and what had happened prior to that, the night before. (R. 58).
After he had given the oral statement, Weed said he wanted his lawyer. The officers wrote out his statement in their own handwriting.
Weed offered no testimony at the hearing to suppress, and the testimony of Officer *27 Nance stands uncontradicted in the record. Following the suppression hearing, the circuit judge stated as follows:
Well, it's true he asked for a lawyer. I believe the record shows he asked for a lawyer three times. He was given an opportunity to call a lawyer and he wasn't able to get him, and from what I heard, then he just voluntarily made this statement. I don't think they asked him any other questions  that's what the evidence is today. If they had asked him some further questions, I certainly would rule in favor of the defendant, but when he just volunteers a statement, I don't feel that the police are called on to say, "Just a minute  you said you wanted a lawyer and I'm not going to listen to you." So I'm going to overrule your Motion to Suppress." (R. 67).
At trial, both Officers Froman and Nance testified about the circumstances that occurred when Weed gave the oral statement at the Greenville Police Department. Their testimony, which was substantially the same as the account given by Officer Nance at the suppression hearing, was not contradicted. Weed took the stand and denied making any incriminating statements to the officers, calling their statements "lies."
If Weed had any disagreement whatsoever as to the circumstances under which he gave the statement to the officers at the Greenville Police Department, he had had two opportunities to present his version: once at the suppression hearing and again during trial by requesting a hearing on the competency of the statement before its submission to the jury. He did neither. The uncontradicted testimony must therefore be accepted by this Court.
Counsel for Weed further argues that the State failed to make a prima facie showing of the admissibility of the statement. We disagree.
He argues that it was necessary for all officers present to testify on a hearing to test the competency of the statement. This is without merit, however, since Weed did not contradict Nance's testimony at the hearing on the motion, or Nance's and Froman's testimony when the statement was offered at the trial. Agee v. State, 185 So.2d 671 (Miss. 1966).
The United States Supreme Court has announced guidelines on the admissibility of statements given by an accused following his request for an attorney. The first consideration is whether there was an "interrogation" following the defendant's request for an attorney. Under the holding of Rhode Island v. Innis, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), we find, as did the trial judge in the present case there was no further interrogation of Weed following his request for his lawyer. He simply sat there a few moments and then voluntarily began to relate to the officers present what had happened.
Even if Officer Nance's inquiry was deemed an "interrogation" the officers scrupulously honored the defendant's right to remain silent when he requested his attorney. Weed intentionally waived his right to counsel during questioning when he chose to speak.
The officers did not engage in the type of conduct condemned in Brewer v. Williams, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977). The officers did not persist in their questioning nor exert pressure of any kind toward Weed in an effort to compel him to make a statement. See also Mansell v. State, 403 So.2d 871 (Miss. 1981). Therefore, the statements given by Weed to the officers were competent and properly admitted into evidence to be considered by the jury.

II.
In addition to the regular panel, upon motion by Weed, a special venire of 125 citizens was summoned. The defendant argues in his brief that two of the decedent's sisters were seen talking to a prospective juror summoned for the special venire and this caused him prejudice in his defense. This juror denied that he even saw these women, and absolutely no misconduct on the part of any prospective juror was shown to the trial judge that would have resulted in prejudice towards the defendant. His *28 main argument is addressed to the supposed duty of a circuit judge to sequester the entire panel of a special venire, and presumably, the regular panel as well, (it being well known the special venire is oft-times exhausted) in a capital case prior to their being selected as jurors for the trial of the case.
The only reason we address this assignment is to put to rest any future contention by trial attorneys that a circuit judge is under any duty to sequester a panel of prospective jurors before their selection as members of the trial panel. Circuit judges do the best they can with the great number of people being summoned for jury duty. It would require a platoon of the local national guard to keep them sequestered from the time they first appear in court under a summons until the jury panel is completely selected. It would cause needless and great expense to the county. If we agreed with imaginative defense counsel, the next request we could expect of a circuit judge would be to have prospective jurors placed into custody when a subpoena was handed them.
The law requires no such measures.
Of course, it is well established that after their selection as jurors to try a capital case, the trial panel must be sequestered. McQuillen v. State, 16 Miss. 587 (1847); Clark v. State, 209 Miss. 586, 48 So.2d 127 (1950); Grimsley v. State, 212 Miss. 229, 54 So.2d 277 (1951).

III.
Was the defendant entitled to a mistrial based upon the following comment by the special prosecutor to the jury during the opening statement: "... he [Pearce] hadn't done anything that would put this defendant in fear of imminent, immediate bodily harm, which you're going to hear a great deal more about from the defendant." (R. 193).
Following this statement defense counsel made a motion for a mistrial in chambers, which was overruled. When the state rested, he again moved for a mistrial, claiming the comment was forcing him to make the decision to have Weed take the stand, a decision he might not otherwise have to make absent the prosecutor's comment.
On this assignment of error, we cannot avoid the suspicion that counsel was somewhat disingenuous with both the trial court and this Court.
In his questioning of the jury, defense counsel made it clear that he intended to place Weed on the stand. He asked the prospective jurors, more than once, if they could try Weed on the facts of this case alone, and disregard his previous convictions for assault and battery and for grand larceny. Defense counsel well knew that these prior convictions would have been incompetent as evidence at trial had Weed never taken the stand as a witness in his own behalf. It is inconceivable to this Court that he would have asked such questions of the jury if he did not firmly intend at that time to have his client take the stand. Also, in his questions to the jury, he stated that the defense was self-defense: Weed shot Pearce, "... because he knew or had good reason to believe that he was in danger of imminent, great bodily harm."
These comments by defense counsel were all made before the objectionable statement was made by the special prosecutor to the jury. It could very well be argued that these questions invited the comment by the special prosecutor. It certainly reveals that the prosecution was not attempting to badger the accused into testifying.
Furthermore, in his opening statement to the jury, and following the statement by the prosecution, defense counsel made it clear that he expected Weed to testify in his own behalf. He related facts to the jury that he expected to prove which could only have been related by the defendant.
Finally, if any error was committed by this comment, it was cured by Weed actually taking the stand as a witness in his own behalf. Here we do not have the facts similar to those found in Hines v. State, 339 So.2d 56 (Miss. 1976), wherein a similar comment was made by the prosecutor during *29 voir dire of the jury. Because the circumstances under which the prosecutor made the statement are different than in Hines, and because the defendant did not testify in that case, it is not controlling here.
We therefore hold this assignment of error to be without merit.
We are not unmindful of the serious consequences which must befall the prosecution of the state's case when some comment is made by state's counsel or the trial judge, either before or following the presentation of the defense in chief, reflecting upon this constitutional right of a defendant to remain silent. We again urge, as we have upon numerous occasions heretofore, for trial courts and the state's counsel to be especially circumspect in this area.
In this case, however, no reversible error was committed, if there was error at all under the circumstances.

IV.
Did the court err in excluding evidence pertaining to the reputation of the decedent as a habitual user of drugs, the record of a chancery court proceeding showing him to be a drug abuser and dangerous to himself and others, and a hospital record of decedent's commitment as a drug addict?
With prosecutions for bizarre, terrible crimes committed by persons under the influence of some drug, crowding, and sometimes choking, our circuit court dockets, this Court cannot be unmindful of the relevancy of a decedent's reputation as a user of drugs where a jury question has been raised as to who was the aggressor in a homicide. Indeed, long before the epidemic of drug related crimes, we held in Moseley v. State, 89 Miss. 802, 41 So. 384 (1906), the general reputation of a decedent as a violent and dangerous man when under the influence of cocaine was competent, relevant evidence for the consideration of the jury when the defense of self-defense is at issue.
Also, a hospital record revealing drug addiction or a mental condition of a decedent rendering him dangerous to society may likewise be material in determining whether an accused acted in lawful self-defense where a jury issue has been raised as to who was the aggressor. A trial judge using his discretion can excise the portions of the record which are irrelevant and permit the introduction of the pertinent parts pertaining to his addiction and the effects on his mental condition. The relevant portions of such records, or properly certified copies thereof, should not be denied an accused under a lawful claim of self-defense. On the admissibility of such records see generally Britt v. All American Assurance Company of Louisiana, 333 So.2d 629 (Miss. 1976); City of Bay St. Louis v. Johnston, 222 So.2d 841 (Miss. 1969); Miss. Code Ann. § 13-1-77 (1972) (chancery court records); and Miss. Code Ann. § 41-9-101 et seq. (1972) (records of mental institutions and hospitals; Miss. Code Ann. § 41-17-9 (1972).
In State v. Shahane, 219 N.W. 132, 56 N.D. 642 (1928), the North Dakota Supreme Court stated, "... [I]t was competent for the defense to show, if it could be shown, that the deceased was afflicted with a form of insanity at the time of the homicide which made him a dangerous man ... The purpose of evidence of turbulence and violence on the part of the deceased in homicide, is to show the honesty of the belief of the accused of imminent peril." If the deceased had a mental condition rendering him dangerous to society, or was a habitual user or addicted to drugs, and such fact was known to the defendant, he should not be denied the right to place this proof before the jury in determining whether or not he acted in lawful self-defense.
In determining relevancy of such mental condition or drug addiction, we agree with the holding of the Supreme Court of North Dakota in Shahane, the criterion for admissibility of such proof is similar to proof of threats made by the deceased against the accused. Some Mississippi cases setting forth grounds for admissibility of threats are Washington v. State, 307 So.2d 430 (Miss. 1975); Shinall v. State, *30 199 So.2d 251 (Miss. 1967); Rucker v. State, 248 Miss. 65, 158 So.2d 39 (1963); Muse v. State, 158 Miss. 449, 130 So. 693 (1930); Cain v. State, 135 Miss. 892, 100 So. 578 (1924).
In this case, however, such proof would have been secondary as well as cumulative, and its exclusion was harmless. We reach this conclusion because of the following direct and uncontradicted proof of the decedent's condition on the day of the slaying:
(1) Leonard Weed, the brother of the accused, called as a witness for the state, and not as an adverse or hostile witness, testified that just a few minutes before the slaying, the deceased "appeared to be under some type of influence of drugs or something." Further, "He just acted wild. He didn't have any reason; he wouldn't take no for an answer." (R. 343).
(2) Rebecca Johnson, a witness for Weed, testified that, on the same day and shortly before the slaying, the deceased "was real upset." He was "cussing and threatening" the defendant. Further, the deceased "was jumping around, waving his arms and pointing his finger" at the defendant, telling him, "I'm going to kill you, you s.o.b." She further testified that the decedent was on drugs, an opinion she reached because she had seen him on drugs before. (R. 369; 370-371).
(3) Frank Trotter, who likewise observed the decedent at the time Rebecca Johnson observed him, testified that the decedent was threatening to kill the defendant, and the decedent "was pretty well messed up." (R. 397).
(4) Patty Weed, the wife of Leonard Weed, testified that she saw the decedent just a few minutes before the slaying and "he looked wild eyed. I was scared of him." (R. 411).
(5) Murray Akers, an attorney, observed the decedent the morning of the slaying, and testified, "His speech was slurred; he was less than steady on his feet at that time. Later on, in my office and close up, I had a chance to see that his eyes were dilated. He alternated between being either depressed or belligerent in response to what was being said to him, and his responses did not always match the questions put to him."
(6) Mike Dees, a Greenville policeman who investigated the homicide, testified that he found a box of pills at the scene of the slaying. In response to the question of whether he knew the decedent had a propensity for taking drugs, he replied, "I have heard that."
All of the above was in addition to the defendant's own testimony concerning the decedent's appearance on the day of the slaying prior to and at the time of the killing.
Furthermore, the defense was permitted to prove that the general reputation in the community of the decedent for peace or violence was bad, which was not disputed by the state.
The jury clearly had before it the uncontradicted evidence that on the day of the slaying, prior to and right up to the time of the homicide, the decedent, a man with a bad reputation for violence, was acting strangely, or deranged, and appeared to be under the influence of some type of drug. Also, he showed hostility towards and made serious threats to the defendant.
In Powell v. State, 145 Miss. 252, 110 So. 515 (1926), we held the exclusion from evidence before the jury of a communicated threat was harmless error in view of the admission of evidence of two other communicated threats. See also Evans v. State, 315 So.2d 1 (Miss. 1975).
We must conclude in this case that the exclusion of testimony of the general reputation of the decedent as a habitual user of drugs, as well as the chancery court record, and hospital record, was harmless.
The record reflects a case ably prosecuted, vigorously and ably defended before a circuit judge who endeavored to reach the outermost limits in his rulings in favor of the defendant at various stages of the trial proceedings. We find no ground for reversal upon any of the assignments of error.
AFFIRMED.
*31 PATTERSON, C.J., SMITH and ROBERTSON, P. JJ., and SUGG, WALKER, BROOM, LEE and BOWLING, JJ., concur.
NOTES
[1] The statement signed by Weed, from page 55 of the record, reads as follows:

Before we ask you any questions, you must understand your rights.
You have the right to remain silent.
Anything you say can be used against you in court.
You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning.
If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.
If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer.
WAIVER OF RIGHTS
I have read this statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.