984 So.2d 1003 (2008)
Eric Pierre McDOWELL and Barbara (Bobby) Lynn Chapman, Appellants
v.
STATE of Mississippi, Appellee.
No. 2005-KA-02057-COA.
Court of Appeals of Mississippi.
October 2, 2007.
Rehearing Denied March 18, 2008.
*1008 James A. Williams, Joseph A. Denson, Meridian, attorneys for appellants.
Office of the Attorney General by Deirdre McCrory, attorney for appellee.
Before KING, C.J., GRIFFIS and BARNES, JJ.
GRIFFIS, J., for the Court.
¶ 1. Eric Pierre McDowell and Barbara "Bobby" Lynn Chapman appeal their convictions for depraved heart murder. They were each sentenced to a term of life in the custody of the Mississippi Department of Corrections. We find no error and affirm.

FACTS
¶ 2. In 2003, Chapman lived with her boyfriend, Marlon Maurice Davis, in a four-plex apartment on 35th Avenue in Meridian. They lived together for approximately six months. Chapman testified that Davis would become physically violent towards her whenever he was intoxicated. This led to their eventual breakup and the events that resulted in the death of Davis.
¶ 3. By August 17, 2003, Chapman had left Davis and was in the process of removing her property from his apartment. At approximately 2:30 p.m., Chapman arrived at the apartment to retrieve the rest of her property. Davis had been drinking and refused to let her get her property. He brandished a lock-blade knife and the couple struggled. Davis tried to cut off Chapman's ear, but cut her on the back of the neck and face.
¶ 4. Chapman left to see the apartment manager, Charlie Burrage, because he had been able to calm Davis down in the past. Burrage tended to Chapman's wounds and convinced her not to call the police. Burrage left to take a ride with Davis, and Chapman went to where her sister and son lived.
¶ 5. Chapman returned several times that afternoon and evening looking for Davis. The first time was around 5:00 p.m. Davis was not at the apartment because he was riding with Burrage. The second time was around 8:30 p.m. This time, Chapman brought her son, McDowell, with her and parked her car down the street at the Elk's Lodge. McDowell was seventeen years old, and he lived with his aunt on 10th Avenue in Meridian.
¶ 6. McDowell went upstairs to Davis' apartment and started banging on the door. Chapman stayed downstairs and talked with Johnnie Mae Brown who was sitting out on the porch. Brown lived downstairs in the same four-plex. Chapman told Brown about the earlier fight with Davis. Brown asked who was banging on Davis' door. Chapman replied, "My son; let him tear it down." Brown told Chapman that Davis was not at home.
¶ 7. Davis was across the street at William Leggett's apartment. According to Leggett, Davis arrived at his apartment at about 8:30 p.m. Davis was scared and asked Leggett for a gun. Davis said, "somebody was at him," and he needed to protect himself. Leggett refused to give him a gun. Davis called his sister while he was at Leggett's apartment.
¶ 8. Meanwhile, Chapman and McDowell waited for Davis. When neighbors Annette and Sim Clemons pulled up in a car, McDowell ran out and opened the door. Chapman told McDowell, "That's not him." McDowell turned around, went back upstairs and started beating on Davis' door again. Chapman began to tell Annette Clemons about her earlier fight with Davis.
¶ 9. Davis left Leggett's apartment around 9:00 p.m. and crossed the street to *1009 his apartment building. Chapman yelled out to McDowell, "There's Maurice. Here he come." She ran out to talk to Davis. Davis turned his back to the building to face Chapman. Annette testified that Davis was yelling at Chapman to leave him alone, because he did not want to argue. McDowell ran down the stairs, carrying a stick wrapped in tape. He ran up behind Davis and hit him in the head. Davis fell to the ground, and McDowell continued to hit him in the head with the stick and repeatedly stomped Davis. Chapman stood over Davis while the beating took place.
¶ 10. Annette went to call the police, while Sim and Brown ran to help Davis. Before they could reach him, an unknown male in a white jogging suit ran from behind the apartment building and fired a gun in the air. All parties denied knowing the identity of this man. The man also kicked Davis repeatedly. When Annette let it be known that she was on the phone with the police, Chapman, McDowell, and the unknown man all ran toward the Elk's Lodge. When the police arrived, they found Davis' lock-blade knife half opened beside his body.
¶ 11. Davis died at the hospital from a combination of blunt force head trauma and a liver laceration. The police found Chapman's car abandoned in the middle of the road, across town. The police located Chapman and McDowell later that week. Chapman told police that she had put her son up to it, but Davis was not supposed to die.

ANALYSIS
I. Were the verdicts against the sufficiency of the evidence?
¶ 12. In reviewing a sufficiency of the evidence claim, the Court considers the evidence in the light most favorable to the verdict. Bush v. State, 895 So.2d 836, 844(¶ 16) (Miss.2005). Usually, if any reasonable trier of fact could have found the essential elements of the crime beyond a reasonable doubt, we will uphold the verdict. Id.
A. McDowell
¶ 13. McDowell argues there was insufficient evidence to support his murder conviction, but he fails to point to any particular element that was missing. He does, however, maintain that the jury could only conclude that he acted in defense of his mother. The State maintains there is sufficient evidence that McDowell is guilty of depraved heart murder.
¶ 14. Depraved heart murder is the "killing of a human being without the authority of law by any means or in any manner . . . [w]hen done in the commission of an act eminently dangerous to others and evincing a depraved heart, regardless of human life, although without any premeditated design to effect the death of any particular individual." Miss.Code Ann. § 97-3-19(1)(b) (Rev.2006). "An act which poses a risk to only one individual and which results in that individual's death may also be deemed depraved-heart murder." Windham v. State, 602 So.2d 798, 802 (Miss.1992).
¶ 15. Dr. Steven Hayne testified, as a medical expert, that Davis died of a lethal blow to his head and a lethal blow to his liver. The blow to the head was consistent with a blow delivered with the wooden stick that McDowell used. This blow to his head was fatal, independent of the blow to his body. All eyewitnesses testified that McDowell repeatedly struck Davis on the head with the stick, before he and the unidentified third person stomped and kicked Davis. This is sufficient evidence to find that McDowell killed Davis.
*1010 ¶ 16. Further, there was sufficient evidence that McDowell acted without authority of law. A killing in defense of one's self or another human being is justifiable "where there shall be reasonable ground to apprehend a design to commit a felony or to do some great personal injury, and there shall be imminent danger of such design being accomplished." Miss.Code Ann. § 97-3-15(1)(f) (Rev.2006). Brown and Annette testified that Davis made no physical nor verbal threats against Chapman. They did not see Davis brandish his knife against Chapman. Annette testified that Davis was yelling at Chapman to leave him alone because he did not want to argue. The jury could have found that it was unreasonable for McDowell to apprehend that Davis planned to harm Chapman at all, let alone that he presented an imminent danger to Chapman.
¶ 17. Finally, "[a] death which results from a beating may be within the scope of depraved heart murder." Windham, 602 So.2d at 802. For example, beating a one-armed elderly man in the head with a hammer was sufficient evidence of an act imminently dangerous to others and evincing a depraved heart. Id. at 803. Employing weapons such as a "heavy wooden stick" or a two-by-four have also been included within the scope of depraved heart murder. Id.
¶ 18. McDowell used a wooden stick wrapped in duct tape, approached Davis from behind and hit him hard enough in the head to immediately knock him to the ground. McDowell then repeatedly used this weapon to beat Davis in the head while he lay on the ground, unconscious or otherwise unable to defend himself. Indeed, the one and only defensive wound found on Davis was an abrasion over his pinky. This suggests that Davis was repeatedly struck and stomped by McDowell on the head, face and chest, and possibly abdomen, while Davis merely lay there. The fact that Davis' knife was found only half-opened suggests that he never had time to defend himself from McDowell's assault. McDowell inflicted enough force to cause multiple closed head injuries, resulting in "bleeding around the surface of the brain to a volume of approximately one-third of a cup of blood . . . bleeding in the ventricular system of the brain itself . . . also bruising to the brain. . . ." Davis died soon after the beating that night at the hospital.
¶ 19. There was sufficient evidence to find that McDowell committed an act imminently dangerous to Davis and evincing a depraved heart, regardless of human life. Accordingly, we find no merit to this issue.
B. Chapman
¶ 20. Chapman argues that there was no evidence that she and McDowell shared a plan to attack Davis. She maintains that McDowell's actions were a spontaneous reaction to her cry for help. The State replies there was sufficient evidence to support her separate murder conviction.
¶ 21. "Every person who shall be an accessory to any felony, before the fact, shall be deemed and considered a principal, and shall be indicted and punished as such; and this whether the principal have been previously convicted or not." Miss.Code Ann. § 97-1-3 (Rev.2006). On the other hand, "any person who is present at the commission of a criminal offense and aids, counsels, or encourages another in the commission of that offense is an `aider and abettor' and is equally guilty with the principal offender." Swinford v. State, 653 So.2d 912, 915 (Miss.1995) (quoting Sayles v. State, 552 So.2d 1383, 1389 (Miss.1989)). Aiding and abetting is the "offense committed by those perpetrators of a crime who, although not the direct perpetrators of a crime, are yet present at its commission, *1011 doing some act to render aid to the actual perpetrator." Id. It "may be manifested by acts, words, signs, motions, or any conduct which unmistakably evinces a design to encourage, incite or approve of the crime, or even by being present, with the intention of giving assistance, if necessary, though such assistance may not be called into requisition." Id. For example, one who was aware of a plan to kill another and flee to Florida, arranged and was present at the meeting between the murderer and victim, saw the murderer approach the victim with a gun, and fled with the murderer to Florida was guilty of aiding and abetting the murder. Id. In another case, one who purchased the gun used in an armed robbery, gave it to the robber, and shouted, "There she is," as the victim approached was held to be an accessory to the armed robbery. Sanders v. State, 403 So.2d 1288, 1290 (Miss.1981).
¶ 22. From the record, there was sufficient evidence that Chapman aided and abetted McDowell in the murder of Davis. When questioned, Chapman told police that she had put her son up to it, but Davis was not supposed to die. Besides this admission, there was evidence that Chapman returned several times over the course of six hours looking for Davis. She hid her car down by the Elks's Lodge. When McDowell beat on Davis' door for thirty minutes, Chapman commented, "Let him tear it down." When McDowell mistook Sim Clemons for Davis and ran toward him, Chapman called McDowell off, saying, "That's not him." When Davis came across the street and before Chapman even approached Davis, she "hollered" to McDowell, "There go Maurice. Here he come." She positioned herself so that Davis' back was to the apartment building. She did not warn Davis when McDowell ran up behind him with a stick and hit him in the head. She stood immediately over Davis while McDowell and, later a third man, beat Davis in the head and stomped on his head and chest. When it was published that the police had been summoned, she ran with both attackers toward her vehicle, which she left abandoned on the opposite side of town. On this evidence, it is clear that Chapman was not only aware of and approved the attack, but also that she set the whole plan in motion.
¶ 23. There was sufficient evidence for the jury to find that Chapman aided and abetted the depraved heart murder of Davis. Accordingly, we find no merit to this issue.
II. Were the verdicts against the weight of the evidence?
¶ 24. "When reviewing a denial of a motion for a new trial based on an objection to the weight of the evidence, we will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." Bush v. State, 895 So.2d 836, 844(¶ 18) (Miss.2005). The evidence is weighed in the light most favorable to the verdict. Id. The power to grant a new trial should be invoked only in exceptional cases in which the evidence preponderates heavily against the verdict. Id. If the verdict is against the overwhelming weight of the evidence, the proper remedy is to grant a new trial. Id.
A. McDowell
¶ 25. McDowell maintains that the overwhelming weight of the evidence indicates that he was acting in defense of his mother.
¶ 26. We have already discussed the evidence that supported the verdict. As for the evidence that supports McDowell's defense, there was evidence that Davis had *1012 a history of violent behavior when intoxicated. Chapman testified he was drunk that day. Chapman came to her son bleeding after the 2:30 p.m. altercation with Davis. McDowell accompanied his mother unarmed to the apartment. Chapman testified that she only asked him there to help her move her property out. She testified that when Davis came up to her and shouted, "I told you not to bring your damn head back on 35th no more," and he pulled out his knife. Chapman said this is when she yelled out for McDowell to come to her aid. He picked up a pole that was lying in the yard and came to help her. Davis' knife was found half-opened by his body.
¶ 27. On this record, we cannot say that the verdict worked an unconscionable injustice. The knife was not fully opened. No witness saw Davis pull the knife out against Chapman. Chapman was the one who ran up to Davis and started arguing. Brown and Annette testified that he was trying to get away from Chapman, yelling that he did not want to fight with her. Chapman called out to her son before she ever reached Davis. This issue has no merit.
B. Chapman
¶ 28. Similar to our review of the sufficiency of the evidence, here Chapman challenges the evidence of a plan to assault Davis. She says that the finding of a plan is solely based on the weak "hearsay" testimony of Leggett and the police officer. As set out before, the verdict is based on much more evidence other than Leggett's statement about Davis' statement that "somebody was at him," and police testimony that Chapman admitted to putting her son up to a fight with or attack on Davis. Indeed, the jury could have disregarded these statements altogether and still found Chapman participated in the plan to attack Davis. Further, the police officer's testimony about what Chapman said is an admission by a party opponent, and thus not hearsay. M.R.E. 801(d)(2). This issue has no merit.
III. Did the jury instructions represent a fatal variance from the indictment?
¶ 29. Appellants argue that the jury instructions strayed from the accusations in the indictment. In particular, they argue they were indicted for acting together to murder Davis, whereas the jury instructions invited the jury to consider whether they acted with the unknown third person to kill Davis. They believe that the unknown third party killed Davis and this invited the jury to convict them for the unsolicited actions of the third party. The State points out that [the] Appellants did not object to this variance below. Alternatively, the State denies that the prosecution sought to prove that the defendants were acting in concert with the unknown third party.
¶ 30. The indictment charged that Chapman and McDowell:
did willfully, unlawfully, and feloniously in the commission of an act eminently [sic] dangerous and evincing a depraved heart, regardless of human life, although without any premeditated design to effect the death of MARLON MAURICE DAVIS, did kill and murder [Davis], a human being, without authority of law and not in necessary self defense, by hitting him with a wooden stick (pole), and by kicking him.
At trial, the State tried to prove that the unknown third party was a co-conspirator in the attack on Davis. Instruction C-8 charged the jury:
[S]hould you find from the evidence in this case, beyond a reasonable doubt that:

*1013 1. On or about the 17th day of August, 2003 in Lauderdale County, Mississippi;
2. The Defendant, Eric McDowell, acting alone or with others with a common intent, did willfully, unlawfully during an act eminently dangerous to others and evincing a depraved heart, regardless of human life, although without any premeditated design to effect the death of Marlon Maurice Davis, did kill and murder Marlon Maurice Davis, by hitting him with a wooden stick or pole and/or by kicking him.
3. Not in necessary self defense;
then it is your sworn duty to find the Defendant guilty of Murder.
Should the State fail to prove any one or more of these essential elements beyond a reasonable doubt, then you shall find the Defendant not guilty of Murder.
Instruction C-7 was identical, except that it named Chapman as the defendant. Both counsel[s] for McDowell and Chapman represented they had no objection to these instructions. This failure to object to the factual variance waives the issue on appeal. Rubenstein v. State, 941 So.2d 735, 774 (¶ 169) (Miss.2006). This issue has no merit.
IV. Was the jury otherwise properly instructed?
¶ 31. In reviewing the grant or refusal of a jury instruction, we read all the jury instructions actually given as a whole. Fears v. State, 779 So.2d 1125, 1127(¶ 9) (Miss.2000). If the instructions as a whole fairly announce the law and create no injustice, no reversible error will be found. Id.
¶ 32. "Generally, when a jury instruction is offered at trial, it is the duty of the opposing party, in order to preserve the point for appeal, to state a contemporaneous objection in specific terms." Irby v. State, 893 So.2d 1042, 1047(¶ 17) (Miss. 2004). "Furthermore, on appeal a party may not argue that an instruction was erroneous for a reason other than the reason assigned on objection to the instruction at trial." Id.
A. Was the jury adequately instructed on the recklessness required to find depraved heart murder?
¶ 33. [The] Appellants argue that the jury was not adequately instructed on the recklessness required to show imminent danger to others and evincing a depraved heart, regardless of human life. They argue that the instructions assumed that hitting with a wooden stick and kicking were imminently dangerous. The State responds that the depraved heart instructions adequately tracked the statutory language.
¶ 34. Instructions C-7 and C-8 were the depraved heart instructions. As set out previously, the Appellants did not object to these instructions. Moreover, these instructions were virtually identical to the depraved heart instruction presented by and withdrawn by Chapman. Procedural bar notwithstanding, we find the instructions adequately track the statutory definition of depraved heart murder. This issue has no merit.
B. Was the jury properly instructed on culpable negligence manslaughter?
¶ 35. [The] Appellants believe that the culpable negligence manslaughter instructions were inadequate because they did not define "culpable negligence" or "dangerous weapons."
¶ 36. Instructions C-11 and C-12 instructed the jury on culpable negligence manslaughter for Chapman and McDowell, *1014 respectively. Both [the] Appellants represented to the trial court that they had no objection to these instructions. Further, neither Appellant offered any instruction further defining "culpable negligence" or "dangerous weapon." This issue has no merit.
C. Should the court should have granted a heat of passion manslaughter instruction?
¶ 37. [The] Appellants argue they were both entitled to a heat of passion manslaughter instruction. They claim that there was evidence to support this theory of the case. At trial, McDowell never sought such instruction. Therefore, he is procedurally barred from bringing this issue on appeal. Chapman did submit a heat of passion instruction. The trial court refused it, because there was "no evidence to substantiate this instruction." We agree.
¶ 38. A defendant is entitled to jury instructions on his theory of the case if there is evidence that would support a jury's finding on that theory. Montana v. State, 822 So.2d 954, 962(¶ 29) (Miss.2002). Proffered instruction D-6 read:
The Court instructs the jury that manslaughter is defined as one human being killing another human:
1.) Without malice
2.) In the heat of passion,
3.) By the use of a dangerous weapon,
4.) Without the authority of law
5.) And not in necessary self defense
Therefore, if you find from the evidence in this case beyond a reasonable doubt, that the accused, Barbra [sic] (Bobby) Lynn Chapman, killed Marlon Maurice Davis, by kicking him and striking him with a wooden stick (pole) and that killing was done:
1.) Without malice
2.) In the heat of passion,
3.) By the use of a dangerous weapon,
4.) Without the authority of law
5.) [A]nd not in necessary self defense as defend [sic] by Instructions,
6.) [A]nd that it occurred on or about August 17, 2003, in Lauderdale County, Mississippi;
Then under your sworn duty you shall find the defendant, Barbra [sic] (Bobby) Lynn Chapman, guilty of manslaughter.
If you find that the state has failed to prove any one of the essential elements of the crime of manslaughter, then you shall find the accused, Barbra [sic] (Bobby) Lynn Chapman, not guilty.
While there was evidence from which a jury could conclude that Chapman acted in the heat of passion, there was no evidence that Chapman struck or kicked Davis. The only evidence was that she was involved in the plan to beat Davis. In essence, this instruction directed a verdict in favor of Chapman, because she did not physically participate in the fight. Chapman did not attempt to amend the instruction to correct this defect. This issue has no merit.
D. Was the jury properly instructed on self-defense?
¶ 39. [The] Appellants argue that the self-defense instruction did not apprise the jury that it had a duty to acquit if it found that Appellants were acting in self-defense. The State responds that [the] Appellants are procedurally barred from raising this issue on appeal. In the alternative, the State asserts that the jury was instructed elsewhere in the instructions that it had a duty to acquit if it found self-defense. We agree.
¶ 40. Instruction C-13 defined self-defense:

*1015 The Court instructs the Jury that in order to make a killing justifiable on the ground of self defense, the danger to the defendant must be actual, present and urgent or the defendant must have reasonable grounds to apprehend a design on the part of the victim to kill or do some great bodily harm and, in addition to this he must have reasonable grounds to believe that there was imminent danger of such design being accomplished. It is for the Jury to decide the reasonableness of the ground upon which the Defendant acts. A negligent belief of the need to use deadly force will not justify the use of deadly force but may cause the crime to be a manslaughter instead of murder.
[The] Appellants both told the court they had no objection to C-13. Therefore, this issue is procedurally barred.
¶ 41. Procedural bar notwithstanding, this issue has no merit. As previously set out, Instructions C-7 and C-8 informed the jury members if they found that Chapman and McDowell, respectively, acted "in necessary self-defense," then the jury "shall find the Defendant not guilty of Murder." Likewise, the culpable negligence manslaughter instructions, C-11 and C-12, informed the jury that if it found that the Appellants acted in necessary self-defense, "then you shall find the Defendant not guilty of manslaughter." Read as a whole, the jury was adequately instructed on their duty to acquit if they found self-defense.
V. Did the court improperly suppress evidence of Davis' violent character and intoxication?
¶ 42. The Appellants argue that the trial court did not allow Chapman to "fully" testify about "the many acts of violence a few hours before against her by Davis." They also fault the trial court for suppressing evidence that Davis was intoxicated with marijuana, cocaine and alcohol. The State responds that Chapman was allowed to testify as to both of these issues.
¶ 43. These issues first arose during Chapman's attorney's opening statement. He stated that Davis had repeatedly physically abused Chapman throughout their relationship. He later stated that "during the autopsy, [Davis'] blood was analyzed and ." The prosecutor objected to both statements, because evidence of the physical violence would not be relevant unless there was evidence that Davis was the aggressor. The prosecutor objected to the blood test results on the basis of relevancy and prejudice. The trial court sustained both objections "at this time."
¶ 44. These issues arose again during cross-examination of Brown, the first witness. The jury was excused, and the trial court asked if Chapman was claiming self-defense. After a conference between Chapman and her attorney, he told the court that she was not raising self-defense. The court held that Davis' violent character and state of intoxication were inadmissible as irrelevant.
¶ 45. Finally, before Chapman testified, the prosecutor moved to prevent her from testifying about these two topics. Further, he asked that she not even be able to discuss the prior assault on her from 2:30 p.m. that same afternoon. The trial court granted the motion and allowed Chapman to make her proffer. Chapman's proffered testimony indicated that Davis was the aggressor in the fatal confrontation. After the proffer, the trial court reversed itself, "she's claiming self-defense. . . . So since she's now claiming self-defense, then testimony in evidence surrounding who was the aggressor during this event, that's what  she has a right to put forth her defense of self-defense, and we'll go from there."
*1016 ¶ 46. Chapman then testified about Davis' history of physical violence when intoxicated and about his prior assault on her. She further testified that Davis was drunk on the day of his death.
¶ 47. As is evident, there is no merit to [the] Appellants' contention that Chapman was not allowed to testify about Davis' propensity for violence when intoxicated. Moreover, she was allowed to testify about the fact that Davis had been drinking and was drunk. The only question that remains is whether [the] Appellants were denied the right to prove that Davis also had marijuana and cocaine in his system.
¶ 48. The general reputation of a decedent as a violent and dangerous man when under the influence is competent, relevant evidence on the issue of self-defense. Weed v. State, 406 So.2d 24, 29 (Miss.1981). It is relevant to the honesty of the accused's belief that her own life was in imminent peril. Id. If such fact was known by the defendant, she should not be denied the right to place this proof before the jury in determining whether or not she acted in lawful self-defense. Id. However, if the defense theory does not require an inquiry into the victim's character and the proposed evidence bears significant prejudicial value, the trial court properly excludes evidence of the victim's drug use. Pierre v. State, 607 So.2d 43, 53 (Miss.1992).
¶ 49. The trial court initially excluded the evidence of Davis' state of intoxication, because [the] Appellants represented they were not going to claim self-defense. Whether or not Davis was intoxicated was therefore irrelevant at the time the trial court made the initial ruling. When self-defense became an issue, and the trial court changed this ruling, neither Appellant attempted to put the toxicology analysis into evidence. Therefore, the Appellants abandoned the issue as to the blood analysis. This issue has no merit.
VI. Did the court improperly suppress the DNA results of the blood found on Chapman's dress because of prosecutorial misconduct?
¶ 50. During Chapman's testimony, the trial judge sent the jury out of the courtroom while he considered a separate matter. After that matter was resolved, Chapman's attorney brought a stipulation to the court's attention. That stipulation was that DNA testing[1] revealed that the blood on Chapman's dress was hers. The prosecutor had received the DNA results and communicated this fact to the defense. The prosecutor agreed to the stipulation but objected to its admission on relevancy grounds, which the trial court rejected. The prosecutor then objected to a lack of foundation. The trial judge ruled that there was no testimony to establish that the dress Chapman was wearing that night was the dress that was submitted for DNA testing. During the State's case, the trial court released the only detective who could have established the chain of custody from his subpoena compelling him to testify.
¶ 51. Chapman and McDowell argue that the State misrepresented that it stipulated to the entry of the DNA test results, which showed that the blood on the dress belonged to Chapman. They claim that this misrepresentation influenced the outcome of the trial. They argue "that prosecutorial misconduct may `so infec[t] the trial with unfairness as to make the resulting conviction a denial of due process. . . .' To constitute a due process violation, the *1017 prosecutorial misconduct must be `of sufficient significance to result in the denial of the defendant's right to a fair trial.'" Greer v. Miller, 483 U.S. 756, 765, 107 S.Ct. 3102, 97 L.Ed.2d 618 (1987). They assert that this misconduct by the State led to the exclusion of the dress. They argue this ruling prejudiced them because the dress would have corroborated Chapman's testimony that she and Davis had fought earlier that day. Because the trial court's exclusion of the dress and the prosecutor's alleged misconduct are intertwined, we will analyze both issues together.
¶ 52. While discussing whether a prosecutor's improper argument deserved reversal, the Mississippi Supreme Court concluded that, "[b]ecause of the overwhelming evidence of guilt, we hold that any error does not rise to the level of reversal." Gray v. State, 728 So.2d 36, 54 (¶ 72) (Miss.1998). We have held previously "an error in the admission or exclusion of evidence is not grounds for reversal unless the error affected a substantial right of a party." Amos v. State, 911 So.2d 644, 653 (¶ 28) (Miss.Ct.App.2005). In Amos, the trial court prevented the defendant from using an out-of-court statement to establish his theory of self-defense. Id. The trial court believed the statement was hearsay. Id. On appeal we found that "Amos was not harmed by the exclusion of the hearsay statement because its content was wholly cumulative of other testimony. . . ." Id.
¶ 53. Here, the prosecutor's actions do not warrant reversal of the defendants' convictions. Neither Chapman nor McDowell were denied his or her right to a fair trial. Indeed, the DNA evidence was merely cumulative of Chapman's testimony regarding her altercation with Davis prior to his death. Chapman repeatedly testified on direct examination that the blood in the car and on the dress belonged to her and resulted from the earlier fight with Davis. This issue is without merit.
VII. Did other actions of the prosecutor warrant a mistrial?
A. Misrepresentations about statements of a third party
¶ 54. McDowell and Chapman argue they were prejudiced when the State cross-examined Chapman. They assert that certain questions by the State inferred facts that were not in evidence and led the jurors to believe that the unknown gunman, McDowell, and Chapman had planned the attack on Davis in advance. They claim that this testimony improperly bolstered the State's case for murder. However, neither Chapman's nor McDowell's attorneys objected to these questions and the evidence being admitted during trial. Thus, their arguments on this issue are waived on appeal. Hampton v. State, 910 So.2d 651, 657(¶ 18) (Miss.Ct. App.2005).
B. Improper use of leading questions and refreshing recollection
¶ 55. "To justify a reversal because of leading questions requires a finding of manifest abuse of discretion and a finding that the question influenced the answer, causing injury." Seals v. State, 869 So.2d 429, 431(¶ 8) (Miss.Ct.App.2004). McDowell and Chapman argue that the trial court committed reversible error when it allowed the State to repeatedly use leading questions when it examined certain witnesses. McDowell's and Chapman's attorneys only objected to the State's leading questions a few times. When they did, the objections were sustained.
¶ 56. Certainly, any leading questions that McDowell and Chapman did not object to were waived. Hampton v. State, 910 So.2d 651, 657(¶ 18) (Miss.Ct.App. *1018 2005). Furthermore, "[t]rial courts are given great discretion in permitting the use of [leading questions]. . . . This is because the harm caused is usually inconsiderable and speculative, and only the trial court was able to observe the demeanor of the witness to determine the harm." Seals v. State, 869 So.2d 429, 432(¶ 9) (Miss.Ct. App.2004). Thus, we find that the State's leading questions do not justify reversal.
¶ 57. McDowell and Chapman also argue that the trial court improperly allowed a State witness to read from her prior statement. During trial, defense counsel objected when the State gave Brown a copy of her statement that she gave to police in order to help her testify and to "coach her in what to say." This objection was overruled by the trial judge, who concluded that the State was merely trying to refresh the witness's recollection. Mississippi Rule of Evidence 612 is used when "a witness uses a writing, recording, or object to refresh his memory for the purpose of testifying." M.R.E. Rule 612 (emphasis added). Professor Carolyn Stanton in Mississippi Evidence states:
If, after looking at the writing . . ., the witness is able to testify without reading the writing, his recollection is said to be revived or refreshed. If, however, after examining the writing, his memory is not revived, the only way he may be able to testify is to read from the writing. Since the writing is an out-of-court statement, this usually creates a hearsay problem.
Carolyn Stanton, Miss. Evidence § 612 (3rd ed.1995). Thus, any testimony Brown read from her prior statement is hearsay. "However, this Court will only reverse a trial court's decision to admit or exclude evidence if the trial court's decision prejudices a party's case." Foster v. State, 928 So.2d 873, 884 (¶ 39)(Miss.Ct.App.2005). McDowell and Chapman argue that they were prejudiced because Brown's improper testimony showed a plan or scheme, which led to their conviction for murder. We cannot say that the trial court's decision regarding Brown's statement prejudiced either McDowell or Chapman. The record contains a great deal of other evidence of McDowell and Chapman's guilt. For example, Annette Clemons' testimony corroborates Brown's testimony, which Chapman's attorney objected to at trial. Thus, this argument is without merit.
VIII. Were the Appellants denied their right to confront witnesses about the identity of the murder weapon?
¶ 58. McDowell and Chapman argue that they were denied their right to confront witnesses because the identity of the stick exhibited at trial as the murder weapon was established using hearsay.
¶ 59. Detective Boswell, who recovered a stick wrapped in tape from the parking lot of the Elk's Lodge, testified "one of the witnesses advised that." Defense counsel objected to the statement as hearsay. The trial court sustained the objection. The prosecution rephrased his question. The defendants objected to this statement as leading. Again, the State rephrased the question. This time the defendants did not object to the question. Finally, the State attempted to introduce the stick into evidence. The defendants objected based on the grounds of lack of foundation and defective chain of custody. The court overruled these objections. The stick was admitted into evidence.
¶ 60. In the pertinent colloquy, defense counsel did not raise a hearsay objection to the last question. Thus, McDowell and Chapman are procedurally barred from raising this issue on appeal. Hampton v. State, 910 So.2d 651, 657(¶ 18) (Miss.Ct. App.2005). Even if appellants were not *1019 procedurally barred, there is no merit to their argument. Several witnesses testified that McDowell attacked Davis with either a pipe or a stick that was wrapped in tape. Davis' wounds and the testimony of the State's expert established that Davis died of blunt force trauma to his head and mid-section. Thus, the entry of the alleged murder weapon neither adds nor detracts from the State's case. Thus, McDowell and Chapman's argument on this issue is without merit.
IX. Do cumulative errors warrant reversal?
¶ 61. McDowell and Chapman argue that under the cumulative error doctrine their convictions should be reversed. [The] Appellants did not raise this issue in the trial court. Thus, they are procedurally barred from raising the issue on appeal. Gibson v. State, 731 So.2d 1087, 1098(¶ 30) (Miss.1998).
¶ 62. Notwithstanding the procedural bar, this argument is without merit. Our supreme court has held:
that individual errors, not reversible in themselves, may combine with other errors to make up reversible error. . . . The question under these and other cases is whether the cumulative effect of all errors committed during the trial deprived the defendant of a fundamentally fair and impartial trial. Where there is "no reversible error in any part, . . . there is no reversible error to the whole."
Id. at (¶ 31). We have examined each of McDowell and Chapman's numerous assertions of error and hold that the cumulative effect "was not such as to deny the defendant[s] a fundamentally fair trial." Id. Thus, we conclude that [the] Appellants' invocation of the cumulative effect doctrine must fail.
X. Were appellants' trial counsel ineffective?
¶ 63. Constitutional issues are reviewed de novo. Thoms v. Thoms, 928 So.2d 852, 855(¶ 9) (Miss.2006). To prove ineffective assistance of counsel, McDowell and Chapman must demonstrate that their counsel's performance was deficient, and this deficiency prejudiced their defense. Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The burden of proof rests with McDowell and Chapman. McQuarter v. State, 574 So.2d 685, 687 (Miss.1990).
¶ 64. To evaluate the deficiency prong of the Strickland analysis:
a court . . . must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct. A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance.
Strickland, 466 U.S. at 690, 104 S.Ct. 2052. There is a strong presumption that counsel's performance falls within the range of reasonable professional assistance. Id. at 694, 104 S.Ct. 2052. This Court will not second guess counsel's reasonable trial strategy. Hall v. State, 906 So.2d 34, 38(¶ 15) (Miss.Ct.App.2004).
¶ 65. To evaluate prejudice, "the defendant must show that there is a reasonable probability that, but for the counsel's unprofessional errors, the result would have been different." Strickland, 466 U.S. at 694, 104 S.Ct. 2052. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Ross v. *1020 State, 954 So.2d 968, 1004(¶ 78) (Miss. 2007). Our supreme court has recently elaborated upon Strickland as follows:
We will not find ineffective assistance where a defendant's underlying claim is without merit. Similarly, multiple defaults that do not independently constitute error will not be aggregated to find reversible error. Our review is highly deferential to the attorney, with a strong presumption that the attorney's conduct fell within the wide range of reasonable professional assistance. However, an attorney's lapse must be viewed in light of the nature and seriousness of the charges and the potential penalty.
Id. at (¶ 79).
A. McDowell's argument
¶ 66. McDowell states in his brief, "[McDowell] here reiterates many of the arguments made by his Mother. . . . Every decision by Mr. James [Chapman's attorney] was adopted and not contradicted or supplemented by Mr. Jones [McDowell's attorney]." McDowell failed to mention, however, that he did more than merely reiterate the arguments of Chapman on appeal. In fact, McDowell's ineffective assistance of counsel argument is identical to Chapman's. Thus, McDowell continuously asserts that James was ineffective and never mentions his attorney or directs this court to where his attorney was ineffective. As mentioned above, McDowell must show that his counsel was ineffective in order to prove ineffective assistance of counsel. Strickland, 466 U.S. at 687, 104 S.Ct. 2052. McDowell merely states that his counsel followed or adopted every action by James. He does not argue or state anything else. Thus, McDowell's ineffective assistance of counsel argument is without merit.
B. Chapman's arguments
1. Failure to object to hearsay used in State's opening statement
¶ 67. First, Chapman argues that her attorney was ineffective when he failed to object to a comment made by the State during its opening statement. She argues that her attorney should have objected when the State told the jury that William Leggett will testify that the victim told him that "Val was threatening him and that he needed a weapon to protect himself because she said she was going to get some people and they were coming back to get him." She asserts that this hearsay violated the her rights under Crawford v. Washington, 541 U.S. 36, 61, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).
¶ 68. We do not find the attorney's strategy to be deficient. Attorneys rarely object to the opening argument of opposing counsel because the jury is instructed that opening argument is not testimony and that it is merely a summary of what the State expects to prove. Furthermore, Chapman was not prejudiced in this case by her attorney's failure to object. Her right to confront witnesses under Crawford was not violated because William Leggett testified during the trial and her attorney had the opportunity to cross-examine him. Id. Her attorney chose not to cross-examine Leggett because the hearsay statements were not part of his testimony, and Leggett did not say anything that incriminated Chapman or McDowell.
¶ 69. Indeed, Leggett did not testify that "Val was threatening him and that he needed a weapon to protect himself because she said she was going to get some people and they were coming back to get him." Instead, Legett testified that Davis asked him for a gun. When asked if Davis told him "why he wanted a gun," Leggett replied, "No, sir." Then the following exchange occurred:

*1021 Q. What was Mr. Davis' state of mind when you saw him that evening?
A. He was good, like he was scared.
Q. And did he tell you why he was scared?
A. No.
By Chapman's counsel: Object again.
By the Court: Overruled.
Q. Why was he scared.
A. Well, he said somebody was at him.
Q. Did he tell you who was at him?
A. No, he didn't.
Q. Why did you think he was asking you for a gun?
A. He said to protect himself.
Q. So he didn't tell you who he was trying to protect himself from?
A. No, ma'am.
Under Mississippi Rule of Evidence 801(c), the testimony would not be considered hearsay. It is apparent that the statements made by Davis were not offered to prove the truth of the matter asserted, but were offered to prove that Davis was in fear and felt that he needed to protect himself. Under Crawford, Davis' statement was not testimonial and subject to the Sixth Amendment right to confrontation. Therefore, under the Rule and Crawford, Davis' underlying statement would not be considered hearsay and subject to a Crawford analysis.
2. Failure to investigate before making the strategic decision not to assert self-defense
¶ 70. Next, Chapman argues that her attorney was ineffective because he failed to properly research the possibility of asserting self-defense and did not assert self-defense at the beginning of the trial. During the first part of the trial, this decision led to the exclusion of evidence of the fight between Chapman and Davis, Davis' abusive nature toward her, and that he was under the influence of alcohol on the day in question.
¶ 71. The record reveals that Chapman and her attorney's initial strategy was to not employ self-defense. In fact, her attorney requested a recess to discuss the option of self-defense with her. After returning from the recess, he informed the trial court that Chapman would not be asserting self-defense. Thus, the trial court based its evidentiary rulings on this assertion. Later, when Chapman took the stand to make an offer of proof, she testified that she and McDowell acted in self-defense. Chapman made this strategic decision without consulting her attorney. Therefore, we must agree with the trial court and assume that Chapman, either with or without the advice of her trial counsel, changed her strategy during the middle of the trial. Thus, her attorney's actions were reasonable, and we cannot say that counsel was ineffective by not invoking or using self-defense at the beginning of the trial.
3. Failure to cross-examine William Leggett
¶ 72. Chapman argues that her attorney should have objected to all of Leggett's testimony because he was not noticed as a witness. Also, she asserts that her attorney was ineffective when he failed to cross-examine Leggett because this indicated he was not prepared. She argues that if her counsel had cross-examined Leggett it would have shown that Davis was not bleeding when Davis saw him. Thus, this would have established that the blood in the car could not have been Davis' blood.
¶ 73. Chapman's attorney's actions were not ineffective because it was reasonable not to cross-examine Leggett. During Leggett's testimony, neither McDowell *1022 nor Chapman were mentioned. Leggett testified that Davis asked for a gun because he was scared. Because this testimony does not implicate either Chapman or McDowell, counsel's decision not to cross-examine Leggett cannot be considered prejudicial. Therefore, Chapman's counsel was not ineffective with regard to this issue.
4. Failure to cross-examine witness on dress Chapman wore on the day in question
¶ 74. Chapman argues that her attorney was also ineffective because he failed to cross-examine witnesses about whether or not Chapman was wearing a particular dress on the day of Davis' death. This meant that the dress and the DNA stipulation as to the dress containing only her blood were not entered into evidence. This evidence would help to establish Chapman's argument of self-defense. As discussed previously, the actions of Chapman's attorney cannot be considered unreasonable because Chapman asserted self-defense without his permission. Furthermore, Chapman did testify that she wore the dress on the day in question and that her blood was the only blood on the dress, so we cannot conclude that counsel's actions regarding the dress prejudiced Chapman. Thus, Chapman's counsel was not ineffective on this issue.
5. Failed to cross-examine detective J.C. Boswell about fingerprints on the stick that was introduced into evidence
¶ 75. As discussed above, two witnesses identified McDowell as the person who beat Davis to death with a blunt object. Thus, Chapman was not unduly prejudiced by the entry of the stick into evidence. She also was not unduly prejudiced by the fact that Boswell was not cross-examined regarding whether or not there were fingerprints on the stick because the stick neither adds nor detracts from the State's case.
6. Failure to meet hearsay "state-of-mind" with the same
¶ 76. Chapman argues that her attorney should have raised the "state of mind" exception to the hearsay rule. She claims this would have allowed the jury to hear Chapman's purpose for returning to the apartment with her son: to get her possessions. We find the attorney's actions under this issue were not ineffective. Chapman did not suffer any prejudice because this evidence was introduced during her cross-examination by the State.
7. Failure to object to the amendment of the language "wooden stick/ or pole and/or kicking him" and "alone or with others with common intent"
¶ 77. As stated previously, we find the language in the jury instruction adequately tracks the statutory definition of depraved heart murder. Thus, Chapman's attorney was not ineffective because appellants did not suffer any prejudice and the attorney's actions were reasonable.
8. Failure to call "Charlie Burrage" as a witness to corroborate the sole testimony of the defendant
¶ 78. Chapman believes her counsel was ineffective because he failed to call Charlie Burrage as a witness. Chapman testified that Burrage did not want her to go to the police after the first fight. The Court cannot say that the outcome at trial would have been different if Burrage had testified and corroborated Chapman's testimony. Moreover, there is no way for this Court to know what Burrage would say in his testimony. No proffer of evidence *1023 was made. Therefore, her trial counsel was not ineffective because Chapman did not suffer any prejudice.
9. Failed to make timely objections and demand adverse rulings from the court
¶ 79. Chapman argues that her attorney failed to object to leading questions and substantive hearsay. This evidence is corroborated by other evidence in the record. Thus, her attorney was not ineffective because the appellants suffered no prejudice.
10. Argued accessory after-the-fact but failed to request that instruction
¶ 80. Chapman argues that her attorney was ineffective because he argued that Chapman did not commit murder, and that the only crime the State could possibly convict her of is accessory after-the-fact. Often, defense attorneys argue that their client did not do the crime with which he or she is charged, but their client possibly committed another crime. This is a reasonable tactic often employed by defense counsel. Furthermore, we cannot say that adding an instruction for accessory after-the-fact would have led to a different result for the appellants. Thus, James was not ineffective because the appellants suffered no prejudice.
11. Either "plain error" or ineffective counsel
¶ 81. McDowell and Chapman argue that this court must find either ineffective counsel or "plain error." Considering that we have not found merit in any of Chapman's ineffective assistance of counsel arguments, this argument also has no merit.
XI. Did the judge exhibit substantive and procedural bias?
¶ 82. McDowell and Chapman argue that the trial judge exhibited substantive and procedural bias towards the State in his evidentiary rulings and comments in front of the jury. However, trial counsel for McDowell and Chapman did not object to these comments and rulings during the trial. Therefore, these issues "are not properly before this Court. An appellant court may only review those matters properly preserved for appeal during trial." Kearley v. State, 843 So.2d 66, 69(¶ 10) (Miss.Ct.App.2002). Furthermore, after reviewing the record, this court finds that the trial judge did not exhibit bias toward the State. His instructions and rulings were correct statements of the law. He sustained objections for the defendants as well as overruled objections made by the State. Furthermore, all of the contentions of error put forward by McDowell and Chapman in their briefs are not prejudicial.
XII. Should retrial be limited to manslaughter?
¶ 83. In light of our ruling on all other issues, this issue is moot.
¶ 84. THE JUDGMENT OF THE CIRCUIT COURT OF LAUDERDALE COUNTY OF THE CONVICTION OF ERIC PIERRE MCDOWELL OF MURDER AND SENTENCE TO SERVE A TERM OF LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. THE JUDGMENT OF THE CIRCUIT COURT OF LAUDERDALE COUNTY OF THE CONVICTION OF BARBARA (BOBBY) LYNN CHAPMAN OF MURDER AND SENTENCE TO SERVE A TERM OF LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. *1024 ALL COSTS OF THIS APPEAL ARE ASSESSED TO LAUDERDALE COUNTY.
KING, C.J., LEE AND MYERS, P.JJ., CHANDLER, BARNES, ISHEE AND CARLTON, JJ., CONCUR. IRVING, J., CONCURS IN RESULT ONLY. ROBERTS, J., NOT PARTICIPATING.
NOTES
[1] At this time, the DNA lab in New Orleans, Reliagene, was closed down due to Hurricane Katrina, making it impossible to subpoena a witness to testify to the lab results.