# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2024-KA-01346-COA

**TERRY DEMARIS JACKSON A/K/A TERRY JACKSON**                    APPELLANT

v.

**STATE OF MISSISSIPPI**                                          APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 10/14/2024 |
| TRIAL JUDGE: | HON. ROBERT B. HELFRICH |
| COURT FROM WHICH APPEALED: | FORREST COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: MOLLIE M. McMILLAN |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: ABBIE EASON KOONCE |
| DISTRICT ATTORNEY: | EARL LINDSAY CARTER JR. |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 04/14/2026 |
| MOTION FOR REHEARING FILED: | |

**BEFORE WILSON, P.J., McDONALD AND McCARTY, JJ.**

**McDONALD, J., FOR THE COURT:**

¶1.     Terry Demaris Jackson appeals his Forrest County Circuit Court convictions of two counts of touching a child for lustful purposes in violation of Mississippi Code Annotated section 97-5-23 (Rev. 2020)[1] and the concurrent fifteen-year sentences in the custody of the

---

[1] Section 97-5-23(1) provides:

(1) Any person above the age of eighteen (18) years, who, for the purpose of gratifying his or her lust, or indulging his or her depraved licentious sexual desires, shall handle, touch or rub with hands or any part of his or her body or any member thereof, or with any object, any child under the age of sixteen (16) years, with or without the child's consent, . . . shall be guilty of a felony and, upon conviction thereof, shall be fined in a sum not less than One Thousand Dollars ($1,000.00) nor more than Five Thousand Dollars

Mississippi Department of Corrections that he received for each conviction. Jackson argues that his convictions should be reversed because the circuit court erroneously allowed inadmissible hearsay testimony into evidence during his trial. Having considered the record, the arguments of counsel, and relevant precedent, we find no error by the circuit court and affirm Jackson's convictions and sentences.

**Facts**

¶2. On May 16, 2020, Emma Jackson-Esters (Esters) was traveling in her SUV with three of her grandchildren, Kara (age 14), Zoe (age 12), and Aaron (age 3),[2] of whom she had custody. Kara was seated in the front passenger seat, and Zoe and Aaron sat in the middle row.

¶3. Esters picked up Terry Jackson, her son, who was the children's uncle, from a hotel where he was staying to take him to Walmart for groceries. When Jackson got in the car, Zoe moved to the third row, and Jackson sat in the middle row behind Kara and next to Aaron. When they got to Walmart, Jackson changed his mind and said he did not want to get out. Instead, he asked to go to Popeye's, and then he asked to stop at a gas station.

¶4. On their way to a gas station, Jackson reached his hand around Kara's seat from the back and "touched her," trying to slide his hand in her pants. Kara moved her seat up closer to the dashboard in an attempt to make Jackson stop. Kara resorted to putting some snack

---

($5,000.00), or be committed to the custody of the State Department of Corrections not less than two (2) years nor more than fifteen (15) years, or be punished by both such fine and imprisonment, at the discretion of the court.

[2] Fictitious names are used to protect the privacy of the minor children.

cake boxes where Jackson was trying to slide his hand to stop him from reaching her. Kara said she did not tell her grandmother while this was happening because she was scared.

¶5. Jackson then reached back to the third row and moved his hand up Zoe's leg and touched her private area outside her clothes. Zoe pushed Jackson's hand away, told him to stop, and covered herself with a blanket. Zoe then climbed over the seat to move to the cargo area, and Jackson tried to pull her back. Kara could hear Zoe crying and saw her crawl over the seat to get away from Jackson. Esters heard the commotion, but she thought Jackson was just annoying Zoe.

¶6. When they arrived at the gas station, Jackson went inside while everyone else remained in the SUV. Kara and Zoe said they told Esters that Jackson was touching them inappropriately, but Esters did not believe them. Kara then texted her aunt and told her that Jackson had touched her and Zoe.

¶7. Jackson returned and got back in the SUV, sitting in the middle row. As they were about to leave the gas station, Kara noticed her mask on the ground.[3] Esters stopped the vehicle, and when Kara got out to pick up the mask, Esters noticed Jackson turn his phone toward Kara while she was bent down to pick it up. The children's aunt called Esters and told her what Kara texted. After getting off the phone, Esters told Jackson she needed his phone to put a tracker on it. While Esters had Jackson's phone, she saw two videos of the girls, one of Kara bending over to pick up her mask and one of Zoe wrapped in her blanket. Esters proceeded to delete both videos and gave the phone back to Jackson.

---

[3] Because of COVID-19, they all were wearing protective masks.

3

¶8.     When they left the gas station, Jackson pulled his pants down and exposed his penis to Aaron and Zoe.  According to Aaron, Jackson held his penis while putting his fingers in and out of his mouth.  Esters could not see what was happening behind her, but then she heard Aaron say, "Terry, you have a wee-wee."  Esters turned around and saw Jackson with his shorts pulled down and his penis out.  Esters drove Jackson back to his hotel and told him to get out.

¶9.     Esters called the Hattiesburg police to report the incident and met Officers Andrew Reed and Tammy Shelbourn at a nearby gas station.  Esters told Shelbourn what had happened in the SUV.  Jackson was arrested later that afternoon and subsequently charged with two counts of lustful touching for the incidents with the children in the car.

¶10.    Esters went to the police station on May 21, 2020, and gave a written and verbal statement that was videotaped.  Kara and Zoe were interviewed and gave statements to counselors at the Child Advocacy Center in Hattiesburg.[4]

**Procedural History**

¶11.    On December 1, 2021, a Forrest County Circuit Court grand jury indicted Jackson for two counts of gratification of lust, in violation of Mississippi Code Annotated section 97-5-23(1) (Rev. 2020).[5]

---

[4] The children's statements were not entered into evidence and do not appear in the record.

[5] Section 97-5-23(1) provides:

Any person above the age of eighteen (18) years, who, for the purpose of gratifying his or her lust, or indulging his or her depraved licentious sexual desires, shall handle, touch or rub with hands or any part of his or her body or

4

¶12.    On July 8, 2022, Jackson's attorney filed a motion for a psychiatric evaluation of his client, which the court granted.  Dr. John Montgomery performed two forensic mental evaluations of Jackson on March 10, 2023, and April 4, 2023.  Although Jackson had a history of mental issues, Dr. Montgomery determined that Jackson had the sufficient present ability to consult with his attorney.  He stated that Jackson would have known the nature and quality of his action, and that touching a child for lustful purposes was wrong.

¶13.    On May 1, 2024, the court held a status hearing to determine whether Jackson planned to accept a plea bargain or go to trial.  Jackson told the court about his psychiatric disorders.  However, the court noted that his psychiatric evaluation found him to be competent to stand trial.  Jackson said he understood that those were the findings, and he told the court that he did not want to take a plea deal.  Trial was set for May 7, 2024, but continued to August.

*Trial*

¶14.    Jackson was tried on August 20, 2024.  The State called six witnesses, including Esters, Kara, Zoe, Aaron, and the two investigating officers.  Jackson testified in his defense.

*Sergeant Tammy Shelbourn*

¶15.    Sergeant Shelbourn was one of the officers who met with Esters and the children at the gas station after Esters called the police.  She confirmed the ages of everyone involved and described Esters as being emotionally distraught, but Shelbourn said Kara and Zoe had a very flat, non-emotional affect with poor eye contact with the officers.  Shelbourn also told the jury that Jackson was arrested later that day on other charges for contempt of court but

any member thereof, or with any object, any child under the age of sixteen (16) years, with or without the child's consent . . . shall be guilty of a felony.

then later charged with two counts of gratification of lust based on the incidents with the children.

*Emma Jackson-Esters*

¶16. Esters testified that she had three children, Jackson, Wendy, and Santana. Wendy is the mother of Kara, Zoe, and Aaron, but Esters had just been given custody of the children due to an incident with Wendy. Esters told the jury where everyone was sitting inside the SUV on the day in question and confirmed that she picked up Jackson from a hotel to take him to Walmart.

¶17. Esters stated when Jackson got in the car, he made comments about Zoe's feet being dirty, so Zoe moved to the third row while Jackson sat in the middle row with Aaron. Esters said that neither Kara nor Zoe wanted to sit next to Jackson, and because Kara did not want to give up the front seat, Zoe moved to the third row. Esters said they went to Walmart, but Jackson did not want to get out; instead, he wanted to go to Popeye's and then to a gas station. While Jackson went into the gas station, Esters said the girls did not tell her what Jackson had done. Esters said she could not see what was happening, but she did hear Zoe say "stop touching me," and she told Jackson to leave Zoe alone. She also knew Zoe moved from the third row to the trunk area. Esters said, "The only time I saw what happened was when Aaron said, 'Terry you have a wee-wee.'" Defense counsel did not initially object to Esters's testimony of what Aaron had said.

¶18. When asked if she saw what Jackson was doing to Zoe that made her move to the cargo area, Esters said she "did not see none of that." To impeach her, the State showed

6

Esters the written statement she had given to the police in which she had stated that at that time, Terry was pulling Zoe's leg trying to get her back over the seat. When Esters said she just did not recall, or that she thought it was just playful, the State moved to enter the written statement into evidence. Jackson objected, arguing that the statement was full of hearsay from both Zoe and Kara about what happened. The court allowed the statement but would not let it be published to the jury at that time. Esters insisted that she did not know anything wrong was going on until her daughter, Santana, called her and told her what Kara had texted her.

¶19. Esters further testified about the videos she saw on Jackson's phone. She said Kara's mask fell out of the car, and when Kara bent down to pick up the mask, Esters saw Jackson tilt his phone to the side to record Kara bending to pick up the mask. Esters said she tricked Jackson into giving her his phone so that she could delete the video. While doing this, Esters saw a video of Zoe with her blanket wrapped around her. Esters said she deleted both videos because she did not want Jackson to look at them later.

¶20. The State then returned to Aaron's statement, asking Esters if Aaron said anything to get her attention. Esters replied that she turned when she heard Aaron say, "Terry got a wee-wee." This time Jackson objected to the child's statement as hearsay. The State argued that what the child said was not being sought for its truth, and in the alternative, that it was a present-sense impression that caused Esters to look around. The court considered the objection, determined that the tender years exception applied, and allowed testimony of what Aaron said.

7

¶21. Esters testified that she gave a statement to the police five days after the incident occurred, but she did not think she provided the text messages between Kara and Santana, and she could not remember seeing them. Esters stated that she did not believe the girls when they first told her what happened because she did not see it herself. However, she did believe them after her daughter Santana called and when she saw Jackson exposing himself in the backseat. She also stated that she has banned Jackson from her house because he "starts tripping with crystal meth," and the neighbors would see him running down the street naked when he was high.

*Zoe*

¶22. Zoe was twelve at the time of the incident and seventeen at the time of trial. Zoe testified that her grandmother Esters was her caretaker at the time of the incident. She confirmed the above facts about where everyone was sitting in the car. She said that she was not around her "Uncle Jackson" very often. That particular day, Zoe testified that Jackson started "messing" with her leg, "scooting" his hand up her leg, and putting his hand in between her legs. She said he touched her near the top of her private part. Zoe told the jury she kept moving his hand and told him to stop. She had the cover on her to keep him away, but she was unsuccessful. So she moved to the trunk space of the SUV, but even then, Jackson tried to pull her by the leg back to the third row.

¶23. Zoe said that only after her sister Kara told their grandmother about what Jackson did to her did she feel comfortable enough to tell Esters how Jackson also touched her inappropriately. Zoe testified to seeing Jackson's penis out and making suggestive gestures

8

with his hands. Zoe stated that Aaron's statement was what made Esters turn around, and from that point Esters drove Jackson to his hotel, and he got out. Zoe said she spoke with an interviewer at the Kids Hub about how Jackson touched her leg up toward her private area and about his penis being exposed. Zoe admitted she did not see Jackson touch her sister. But she stated that Jackson had touched her (Zoe) previously. Zoe testified that she later moved to Michigan and that she and Esters did not get along due to Esters's defending Jackson.

*Kara*

¶24. Kara, who was fourteen at the time of the incident, was eighteen at the time of trial. Kara testified to the same seating positions of everyone in the car as stated by others. Kara stated that Jackson touched her butt and tried to slide his hand in her pants to touch her private area. Kara said that she put snack boxes to block Jackson from reaching her and scooted her seat closer to the dashboard. Kara said Jackson reached around both sides of her seat to reach her, including the side that was shared with Esters.

¶25. Kara said that she could hear Zoe crying in the back, saw her crawling over the third row, and saw Jackson touching Zoe's leg. Kara told her grandmother what happened when Jackson went into the gas station, but Esters did not believe her. Kara admitted to feeling scared and uncomfortable when Esters did not believe her. Kara texted her Aunt Santana to tell her what was going on in the SUV. Santana called Esters to tell her what was going on, and then Esters started to believe what happened. Kara confirmed Zoe's recollection that Aaron's statement was what caused Esters to turn and see Jackson's penis exposed. Kara

9

stated that she did not turn around because she did not want to see Jackson. Kara admitted that she was unaware that Jackson recorded her when she bent over to pick up her mask. Kara stated that Esters did not want her to testify against Jackson.

*Aaron*

¶26. Aaron was three years old at the time of the incident and seven at the time of the trial. The child was initially questioned to determine that he could tell right from wrong. Then Aaron testified to being in the car with his family. Aaron said he saw Jackson rubbing Zoe's leg and Zoe crying under the cover. Aaron testified to seeing Jackson expose his "ding-a-ling," and he saw Jackson putting his fingers in and out of his mouth. Aaron said he (Aaron) said something about this, and then Esters turned around and saw Jackson with his penis exposed, and she got mad. Jackson made no objection to Aaron's testimony, nor did he cross-examine the child.

*Sergeant LaShonda Buckhalter*

¶27. Sergeant Buckhalter was a detective with the Hattiesburg Police Department who investigated cases of domestic violence and all sex crimes, including crimes against both children and adults. Buckhalter testified that she interviewed Jackson after he had been arrested and had been read his *Miranda* rights.[6] Buckhalter stated that during the interview, Jackson told her about his interactions with his mother and nieces on the day of his arrest. According to Buckhalter, Jackson stated that he had a small argument with his nieces. He told them that they needed to work on their hygiene and that he touched one on the leg and

---

[6] *Miranda v. Arizona*, 384 U.S. 436 (1966).

one on the arm. He admitted they pulled away from him, and they did not want him touching them. Jackson told Buckhalter that the girls were vocal and stated "ooh, don't touch me" or "I don't want you touching me."

¶28. Buckhalter also said that at first Jackson denied recording the girls, but later he admitted that he recorded Kara when she got out of the car. Jackson said that Esters took his phone and deleted the videos. Jackson also admitted that he had used "meth" and drank Hennessy before Esters picked him up from his hotel. But Jackson denied exposing himself to the children or touching the children in an inappropriate manner. Jackson also told Buckhalter that Esters threw him out of the car and did not want to deal with him anymore.

¶29. Buckhalter testified that Esters was not coerced or threatened but that she was willing to give a written statement. The State renewed its request to admit Esters's written statement, arguing that it was admissible under the recorded recollection exception to hearsay. Although Jackson objected, the court admitted Esters's statement into evidence. Buckhalter further testified that she viewed the video of Esters's interview, and it matched what Esters said in her written statement.

*Motion for Directed Verdict*

¶30. The State rested, and Jackson moved for a directed verdict, arguing that the State had failed to make a prima facie case for lustful touching. The Court denied the motion, and the defense called Jackson as its only witness.

*Terry Jackson*

¶31. Jackson testified that he was a drug addict but that he did not recall telling the

11

detectives that he had taken meth and drank a fifth of Hennessy on the day of the incident. Jackson admitted to pulling his shorts down in the SUV with his family because he was "tripping out." When he "trips out," he feels like something is crawling on him, so he takes off his clothing to look at the spot where he feels the crawling. He stated that normally, once he looks at the spot, the crawling feeling goes away.

¶32. Jackson admitted that during the forensic mental evaluation that he knew that the touching was wrong, but he stated on the day of the incident that he was experiencing a psychotic disorder. He said he did not recall calling the girls "slow" or saying they did not like him. Jackson testified that he did not recall recording videos or Esters deleting them. Jackson stated he did not tell the detectives he was experiencing a psychotic breakdown on May 16, 2020, because the detectives did not ask the right questions. Jackson testified that he told Esters not to allow Kara and Zoe to testify against him. He said he was afraid that the girls would not understand that he was having a psychotic breakdown because they had never seen him like that.

*Verdict*

¶33. The State presented no rebuttal, and both parties rested. The jury was instructed, and after closing arguments, it deliberated and found Jackson guilty on both counts charged. The Court ordered that a pre-sentence investigation be completed and provided to the court and the attorneys.

*Sentencing*, *Post-trial Motion, and Appeal*

¶34. On October 10, 2024, the court held a sentencing hearing. Jackson apologized to the

court and promised to take his medicine and stay away from drugs. His attorney told the court that he felt Jackson was genuinely remorseful and was making progress. The State pointed out that in the pre-sentence investigation, Jackson was still denying the charges and that at the time of the incident, Jackson had been out of jail on bond for a voyeurism charge of looking in women's bathrooms at Forrest General Hospital. The court proceeded to sentence Jackson to serve fifteen years of incarceration on Count I and fifteen years of incarceration on Count II, in the custody of the Mississippi Department of Corrections, with the sentences set to run concurrently.

¶35. On October 29, 2024, Jackson filed a motion for judgment notwithstanding the verdict or, in the alternative, a new trial, arguing that the State had not proved the elements of the charges against him and that his sentence violated his Eighth Amendment right against cruel and unusual punishment. The court denied the motion on October 30, 2024, and on November 15, 2024, Jackson filed a notice of appeal.

¶36. Jackson raises two issues on appeal: whether the circuit court erred in allowing Aaron's statements into evidence, and whether the circuit court erred in allowing Esters's written statement to the police into evidence. Both, Jackson argues, were inadmissible hearsay.

**Standard of Review**

¶37. "The standard of review for the admission of hearsay evidence is abuse of discretion." *Cosby v. State*, 425 So. 3d 1026, 1032 (¶15) (Miss. Ct. App. 2025) (citing *Beale v. State*, 361 So. 3d 673, 682 (¶40) (Miss. Ct. App. 2022)).

13

## Discussion

### I. Whether the trial court erred in allowing Aaron's statements into evidence.

¶38. Esters, Kara, and Zoe all testified that Aaron said, "Terry, you have a wee-wee," which led Esters to look back and see Jackson with his shorts pulled down and his penis exposed. Jackson contends that this testimony was inadmissible hearsay, or in the alternative, that the court failed to hold a hearing to determine the reliability of the child's statement as required by the tender years exception to hearsay in Rule 803(25).[7]

¶39. Rule 801 of the Mississippi Rules of Evidence defines hearsay as "a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement," or, in other words, an out-of-court statement offered to prove the truth of the matter asserted. *Washington v. State*, 373 So. 3d 1051, 1055 (¶17) (Miss. Ct. App. 2023) (citing *Crist v. Loyacono*, 65 So. 3d 837, 844 (¶21) (Miss. 2011)). "So for an out-of-court statement to be admissible, it must either be offered for some other proper purpose, or fall into one of the

---

[7] Mississippi Rule of Evidence 803(25) provides:

Tender years exception. A statement by a child of tender years describing any act of sexual contact with or by another is admissible if:

> (A) the court—after a hearing outside the jury's presence—determines that the statement time, content, and circumstances provide substantial indicia of reliability; and

> (B) the child either:
> (i) testifies; or
> (ii) is unavailable as a witness, and other evidence corroborates the act.

14

enumerated exceptions to the general hearsay rule." *Id.*

¶40.    The threshold question is whether the testimony is offered for the truth of the matter because an out-of-court statement made for some other reason can be admissible nonhearsay. For example, in *Pickett v. State*, 143 So. 3d 596, 599 (¶9) (Miss. Ct. App. 2013), Pickett was found guilty of sexual battery of his thirteen-year-old stepdaughter when his wife found them in the child's bedroom, with the child kneeling on the floor facing Pickett, who had his pants and underwear pulled down. *Id*. at 598 (¶6).  Pickett's wife, who had returned home from the store, was prompted to check the bedroom when her eight-year-old son, who was in the living room, said, "How come Daddy is always in the back with Brandy when you leave?" *Id*. at (¶5).  The trial court allowed the wife to testify to the son's statement over Pickett's objection, finding it to be hearsay but admissible under an exception in Rule 803.  *Id*. at 599 (¶10).  On appeal, Pickett claimed the son's statement was inadmissible hearsay.  *Id*. at 600 (¶14).  We disagreed and found that the wife's testimony about what the son told her was admissible because it was not hearsay as defined in the Rules.  *Id*. at (¶15).  We noted that the son's statement was not admitted to prove the truth of the matter asserted; "rather, it was admitted only to show why [the wife] did what she did, i.e., went to the back room."  *Id*. at 601 (¶15).  Although the reasoning of the trial court differed from ours, we stated that "it is the customary practice, in the name of judicial economy, for an appellate court to affirm the trial court if the right result is reached even though for the wrong reason."  *Id*. at 600 (¶14) (citing *Puckett v. Stuckey*, 633 So. 2d 978, 980 (Miss. 1993)).  Consequently, we found that the trial court incorrectly identified the evidence as hearsay but reached the correct result in

allowing its admission. *Id.* at (¶15).[8]

¶41. Similar to *Pickett*, in the case at hand, Esters, Kara, and Zoe all testified that they heard Aaron say, "Terry, you have a wee-wee." This testimony was offered not to establish the truth of the matter, but because the child's statement caused Esters to turn around and see that Terry had exposed himself. Accordingly, it was not hearsay and was admissible. Later in the trial, Aaron testified about what he had seen, and that testimony was obviously offered to prove that Terry had exposed himself. But Jackson did not object, nor did Jackson cross-examine the child. As in *Pickett*, testimony from Esters, Kara, and Zoe about Aaron's statement was admissible to show why Esters turned around. Accordingly, even though the circuit court admitted the testimony for a different reason, i.e., under the tender years exception, the court reached the right result, and we find no error in the admission of the statement. *See Holstein v. Nicholas*, 399 So. 3d 959, 963 (¶9) (Miss. Ct. App. 2025) ("[T]his Court may affirm the circuit court's judgment if the right result was reached, even if the circuit court reached the result for the wrong reason.").

## II. Whether the trial court erred in admitting Esters's written statement to police into evidence.

¶42. Jackson also challenges as impermissible hearsay the circuit court's admission of the written statement that Esters had given to the police. The State responds that the statement constituted Esters's contemporaneous "recorded recollection," which Rule 803(5) excepts

---

[8] *See also Beale*, 361 So. 3d at 682 (¶43) (showing a witness's statement to a law enforcement officer was admissible because it was not admitted to prove the truth of the matter asserted, but rather, to explain the next steps the officer took in the course of his investigation).

from the prohibition of hearsay, or, in the alternative, that any "technical error" in its admission did not result in any prejudice to Jackson.

¶43.   "The relevance and admission or exclusion of evidence is a matter of the trial court's discretion." *Foster v. State*, 928 So. 2d 873, 884 (¶35) (Miss. Ct. App. 2005). "This Court will only reverse a trial court's decision to admit or exclude evidence if the trial court's decision prejudices a party's case." *Id.*

¶44.   As noted above, hearsay is defined as an out-of-court statement presented to prove the truth of a matter asserted, MRE 801(c), and is not admissible. MRE 802. However, there are several exceptions under Rule 803 where testimony or documents that are hearsay are still admissible. Rule 803(5) allows the admission of statements made in a document that would constitute a "recorded recollection," which is defined as:

> A record that:
>
>> (A) is on a matter the witness once knew about but now cannot recall well enough to testify fully and accurately;
>>
>> (B) was made or adopted by the witness when the matter was fresh in the witness's memory; and
>>
>> (C) accurately reflects the witness's knowledge.
>
> If admitted, the record may be read into evidence but may be received as an exhibit only if offered by an adverse party.

MRE 803(5). This last element—that the document be entered as an exhibit by the adverse party—is critical and was found dispositive in a custody and visitation dispute in *Myers v. Myers*, 324 So. 3d 808 (Miss. Ct. App. 2021). There, the chancery court excluded a recording that the mother had made on her phone of one of the children saying that she did

17

not want to return to the father's house because he had hurt her. *Id*. at 822 (¶63). On appeal, the mother argued, among other things, that the recording was a recorded recollection under Rule 803(5). *Id.* at (¶65). We agreed with the chancery court's exclusion of the evidence because the recording was not offered by the father, the adverse party, and thus it did not meet the recorded recollection exception criteria. *Id*. at 823 (¶66).

¶45.     Reviewing the record in this case, Esters testified at a trial, held four years after the incident, that she could not see what Jackson was doing to Zoe that made Zoe move to the cargo area of the vehicle. The State presented Esters with the statement she had given to the police only a few days after the incident. After reading the statement to herself, Esters admitted that Zoe had crawled into the back, but she thought it was just Jackson "messing with her, and she didn't want him - - to be bothered." The State pressed further, "[A]nd you acknowledged that you said at the time that Terry was pulling her leg trying to get her back over the seat." Esters responded, "I never saw him pull her leg, but I thought he had reached back, you know." The State continued, "[A]nd you told Terry to leave her alone, right?" Esters replied, "Right, but I didn't know it was of a sexual nature." The State then offered Esters's entire written statement into evidence, stating that it was being used for impeachment. Jackson objected, arguing that the statement contained information reported by the children, i.e., hearsay within hearsay. The court ultimately admitted the statement into evidence as an exhibit.

¶46.     It is clear that Esters's written statement met criteria A, B, and C of Rule 803(5). However, for the document to be admitted as an exhibit, as we held in *Myers*, it would have

18

to have been introduced by Jackson, not the State. Therefore, we hold that the circuit court abused its discretion in admitting Esters's statement as an exhibit. However, we find that the circuit court's decision did not prejudice Jackson and that the admission of the statement was harmless. In a similar case where hearsay was erroneously admitted, we held that the error did not prejudice the defendant or warrant reversal. *McDowell v. State*, 984 So. 2d 1003, 1018 (¶57) (Miss. Ct. App. 2007). In that case, we held that the trial court erroneously allowed a State's witness to read a copy of the statement he had given to the police to the jury. *Id*. We stated that "any testimony Brown read from her prior statement is hearsay." *Id*. However, we further held that "this Court will only reverse a trial court's decision to admit or exclude evidence if the trial court's decision prejudices a party's case." *Id*. We then concluded that we could not say that the trial court's decision regarding the statement prejudiced the defendants in that case because "the record contain[ed] a great deal of other evidence" of their guilt. *Id.* Similarly, in the case at hand, there was ample testimony from Kara, Zoe, and Aaron, as well as from Jackson himself, in additional to Esters's "statement," to establish Jackson's guilt. Therefore, we find no reversible error in the circuit court's admission of Esters's statement to the police.

## Conclusion

¶47. Because the minor child's statement in the vehicle that caused the Esters to turn around was not hearsay, and because any error in the admission of the Esters's written statement to the police did not prejudice Jackson, we affirm Jackson's convictions and sentences.

19

¶48. **AFFIRMED.**

**BARNES, C.J., CARLTON, P.J., WESTBROOKS, LAWRENCE, McCARTY, WEDDLE AND LASSITTER ST. PÉ, JJ., CONCUR. WILSON, P.J., AND EMFINGER, J., CONCUR IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.**